# American Museum of Fly Fishing, Inc. v. Town of Manchester and Village of Manchester

[557 A.2d 900]

No. 86-377

Present: **Allen, C.J., Peck, Gibson and Mahady, JJ.**

Opinion Filed February 3, 1989

*Charles R. Eichel,* Manchester Center, and *Joy C. Frank,* Dorset, of Counsel, for Plaintiff-Appellant.

*Joseph J. O'Dea, P.C.,* Manchester, for Defendant-Appellee Town of Manchester.

*W. Michael Nawrath,* Manchester Center, for Defendant-Appellee Village of Manchester.

**Gibson, J.** Plaintiff appeals a declaratory judgment of the Bennington Superior Court determining that plaintiff is not exempt from property taxation under 32 V.S.A. § 3802(4), but that the Town could vote to exempt plaintiff from property taxes pursuant to 32 V.S.A. § 3840. We reverse.

## I.

Neither party questions the trial court's findings, which reveal the following relevant facts. Plaintiff is a nonprofit, Vermont corporation, exempt from federal and state income taxation. It was organized for the purpose of "[e]ngaging in, assisting and contributing to the support of exclusively charitable, scientific and educational activities" relating to the sport of fly fishing. In October of 1983, plaintiff purchased a building in the Village of Manchester to be used solely as a museum in support of plain-

tiff's above-stated corporate purpose. The museum opened in late May of 1984. Since then, it has been open daily to the general public free of charge.

The Town and Village of Manchester assessed property taxes on the museum for the year 1984. Plaintiff appealed to the Town of Manchester Board of Civil Authority, asserting its alleged tax-exempt status. The Board denied this request. Plaintiff subsequently brought suit in the superior court, seeking a declaratory judgment that the museum was exempt from all property taxes under 32 V.S.A. § 3802(4).[1] The trial court held that plaintiff was not exempt under § 3802(4) since plaintiff had not assumed an essential governmental function. The court also found that 32 V.S.A. § 3832(7), denying automatic tax exemptions for property "used primarily for . . . recreational purposes," did not apply to the museum. The court went on to conclude that the provisions of 32 V.S.A. § 3840[2] did apply since "plaintiff is associated for charitable purposes and the real estate that it owns is used solely for its charitable, nonprofit purposes . . . ."

Plaintiff appeals, raising three issues. We find plaintiff's first argument, that the trial court erred in applying the test of assumption of an essential governmental function to the museum, dispositive of this appeal. We, therefore, do not reach plaintiff's remaining claims. In light of this Court's previous mixed interpretations of § 3802(4), we shall review briefly the historical development of the "essential governmental function" test and set forth what we consider to be the proper "public use" test for application on remand.

## II.

An important early case interpreting 32 V.S.A. § 3802(4), then designated as V.S. 1947, § 649, was *Fort Orange Council, Inc.* v.

---

[1] 32 V.S.A. § 3802 reads in pertinent part: "The following property shall be exempt from taxation:. . . (4) Real and personal estate granted, sequestered or used for public, pious or charitable uses . . . ."

[2] 32 V.S.A. § 3840 provides in pertinent part:
   When a society or body of persons associated for a charitable purpose, in whole or in part, . . . owns real estate used exclusively for the purposes of such society, body or organization, such real estate may be exempted from taxation, either in whole or in part, for a period not exceeding ten years, if the town so votes. Upon the expiration of such exemption, a town may vote additional periods of exemption not exceeding five years each.

*French,* 119 Vt. 378, 125 A.2d 835 (1956). In that case, this Court held that a camp operated by the Boy Scouts of America, a New York corporation, was not entitled to a exemption because the corporation served only a limited group, the members of the Boy Scout organization. The Court stated that in order to claim an exemption under the statute, the property in question must not serve a "closed circle" of members, but must be open to the public at large. *Id.* at 384, 125 A.2d at 839.

In *New York Institute for the Education of the Blind* v. *Town of Wolcott,* 128 Vt. 280, 262 A.2d 451 (1970), this Court affirmed the grant of a tax exemption to a summer remedial school/camp for blind children. The Court held that § 3802(4), not § 3840, applied, and that in order to qualify for exemption under § 3802(4), "the property of the Institute must be used for public use and its use confer a benefit upon an indefinite class of persons who are a part of the public." *Id.* at 285, 262 A.2d at 454. The Court found that the Institute met this test because the property was used to benefit an indefinite class of persons: blind children. The Court distinguished *Fort Orange Council* by noting that the class of persons in that case was " 'a closed circle to those outside the organization,' " *id.* at 286, 262 A.2d at 455 (quoting *Fort Orange Council,* 119 Vt. at 384, 125 A.2d at 839), and asserting that the class was determined by "choice or selection and implie[d] some kind of voluntary action or judgment."*Id.*

*Shelburne Museum, Inc,* v. *Town of Shelburne,* 129 Vt. 341, 278 A.2d 719 (1971), which followed shortly thereafter, involved the question of whether two homes on the premises of the museum qualified for an exemption under § 3802(4).The Court established that in order to attain tax-exempt status under § 3802(4), "the property must confer a benefit upon that segment of the public which the institution was designed to serve." *Shelburne Museum,* 129 Vt. at 344, 278 A.2d at 721. The Court held that one of the properties, the director's home, was exempt, because it was used for various business and entertainment functions of the museum and thus furthered the "purposes and aims of the museum." *Id.* The other home, occupied as a dwelling by a landscape artist, was not exempt, however, because the benefit derived from its use was only "collateral to the historical and educational purposes" of the museum. *Id.* at 345, 278 A.2d at 721.

The theoretical foundation of the essential-governmental-function test arose in *English Language Center, Inc.* v. *Town of Wallingford,* 132 Vt. 327, 318 A.2d 180 (1974), wherein the Court denied a public use exemption to a nonprofit school that taught English to students whose native tongue was other than the English language. The Court held that "[e]xemptions are granted for the performance of service essentially public in nature on the theory that such service benefits the public generally and, in so doing, assumes a share of the public burden." *Id.* at 329-30, 318 A.2d at 182. The Court also stated that "[w]hatever directly promotes individual interest, although it may also tend incidentally to the public benefit, is essentially a private, and not a public, activity." *Id.* at 331, 318 A.2d at 183. The English Language Center did not fall within the purview of a public use because it served only a select segment of the public and not the public generally. As the Court correctly noted, public uses are essentially public in nature and benefit the public generally. It does not, however, follow that public uses must *necessarily* be those that assume a public burden. This is a fine point that was not necessary to the outcome of the case.

The Court applied a similar rationale in *Vermont Wild Land Foundation* v. *Town of Pittsford,* 137 Vt. 439, 407 A.2d 174 (1979). In that case, the Court denied an exemption for property that consisted of primeval forest, but the access to which was strictly limited to those involved in scientific research. The Court found that "[a]lthough the Foundation's endeavors are admirable, the benefit to the public is too tangential to require the support of the community . . . ." *Id.* at 444, 407 A.2d at 177.

The current "essential governmental function" test was first enunciated in *Brattleboro Child Development, Inc.* v. *Town of Brattleboro,* 138 Vt. 402, 416 A.2d 152 (1980), in which a day care center argued that it qualified for tax-exempt status on the ground that, by caring for the children of working parents, it rendered a benefit to the public generally. The Court upheld the trial court's determination that the services provided by the plaintiff were "essentially private" in nature, concluding that " 'the benefit to the public [was] too tangential to require the support of the community.' " *Id.* at 408, 416 A.2d at 156 (quoting *Vermont Wild Land Found.,* 137 Vt. at 444, 407 A.2d at 177). In arriving at its ultimate holding, the Court balanced the historical basis of the exemption for the "support of schools and churches believed nec-

essary for the encouragement of settlement in colonial . . . Vermont," against "the increasing cost of town and city governments and the services which they provide." *Id.* at 405, 416 A.2d at 154 (citing *Broughton* v. *Town of Charlotte,* 134 Vt. 270, 272-73, 356 A.2d 520, 522 (1976), and *Experiment in Int'l Living* v. *Town of Brattleboro,* 127 Vt. 41, 50, 238 A.2d 782, 788 (1968)). See generally Note, *Exemption of Educational, Philanthropic and Religious Institutions from State Real Property Taxes,* 64 Harv. L. Rev. 288 (1950). In the course of its opinion, the Court stated that in order to claim tax-exempt status under 32 V.S.A. § 3802(4), a plaintiff must "assume a burden of the municipality to provide a service which the legislature has determined to be an essential governmental function." *Brattleboro Child Dev.,* 138 Vt. at 406, 416 A.2d at 155.[3] As will be discussed in the next section of this opinion, we believe such a criterion unjustifiably narrows the basis for which tax-exempt status as a public use under § 3802(4) may be claimed.

Finally, the "essential governmental function" test was most recently applied in *Ski-Lan Gymnastics & Performing Arts Educational Foundation, Inc.* v. *City of Rutland,* 143 Vt. 294, 465 A.2d 1363 (1983), wherein the Court denied an exemption to a school that taught children gymnastics and the performing arts. The Court held that plaintiff was not entitled to an exemption because it had "assumed no burden of the municipality which the legislature has determined to be an essential governmental function." *Id.* at 297, 465 A.2d at 1365. As further justification for its decision, the Court declared that the plaintiff's request for an exemption would be denied because "plaintiff's services provide[d] an essentially private benefit to a limited class of persons . . . ." *Id.*

Considering the previous history of the law in this area of our jurisprudence, it is readily apparent how the trial court came to apply the "essential governmental function" test to the facts of the instant case. We shall now examine why we believe this test to be an incorrect statement of the law.

---

[3] The Court also stated that the test was not limited to property used in providing educational services. *Brattleboro Child Dev.,* 138 Vt. at 407, 416 A.2d at 155.

## III.

In interpreting a statute, legislative intent should be gathered from "a consideration of the whole and every part of the statute, the subject matter, the effects and consequences, and the reason and spirit of the law." *Holbrook Grocery Co.* v. *Commissioner of Taxes,* 115 Vt. 275, 278-79, 57 A.2d 118, 120 (1948). The definitive source of legislative intent, however, is the language of the statute itself, if that language plainly sets forth the intent of the Legislature. *Hambley* v. *Town of St. Johnsbury,* 130 Vt. 204, 206-07, 290 A.2d 18, 20 (1972); see also *In re Middlebury College Sales & Use Tax,* 137 Vt. 28, 31, 400 A.2d 965, 967 (1979) (in construing statute, plain ordinary meaning of language is presumed to be intended, and when meaning is plain, courts must enforce statute according to its terms). It is well established that "[a]n exemption will be strictly construed against the party claiming it, and any doubts as to its application will be interpreted against the exemption. Exemption statutes must be construed reasonably, and not in a manner that defeats the purposes of the statute." *In re Northeast Washington County Community Health Center,* 148 Vt. 113, 115, 530 A.2d 558, 559 (1987) (citations omitted). This Court has also stated that "tax exemption statutes are strictly construed by confining their meaning to the express letter or necessary scope of their language." *Brattleboro Child Dev.,* 138 Vt. at 404, 416 A.2d at 153. Thus, the language of § 3802(4) may not be so broadly construed as to include uses not within the letter of the law, but neither may it be so strictly construed as to defeat the purpose of the statute by excluding public uses which do not assume "mandated governmental services." See *Ski-Lan Gymnastics,* 143 Vt. at 297, 465 A.2d at 1365 (services held not "mandated" because city not required to teach such courses in its schools or offer such programs through its recreational facilities).

This Court has consistently held that in applying the general exemption contained in 32 V.S.A. § 3802(4) for the "[r]eal and personal estate . . . used for public, pious or charitable uses," the crucial factor is the primary use to which property is put. *Fletcher Farm, Inc.* v. *Town of Cavendish,* 137 Vt. 582, 584, 409 A.2d 569, 570 (1979); *Experiment in Int'l Living,* 127 Vt. at 47, 238 A.2d at 786; *Middlebury College* v. *Town of Hancock,* 115 Vt.

157, 164, 55 A.2d 194, 198 (1947).[4] As was stated in *English Language Center,* 132 Vt. at 329-30, 318 A.2d at 182, an exemption from taxation for public use is granted "for the performance of service essentially public in nature on the theory that such service benefits the public generally and, in so doing, assumes a share of the public burden." An exemption only for assumption of "essential governmental functions" is nowhere stated in the statute, nor can it fairly be inferred from the language of the statute. See *Broughton,* 134 Vt. at 275, 356 A.2d at 523 (legislative purpose of § 3802(4) "was to provide for the furtherance of the general welfare by promoting the direct employment of property for services which would otherwise have to be offered by the state *or which should be encouraged by the state for humanitarian purposes.*") (emphasis added). The statute employs the term "public uses," not "mandated municipal services," or even "essential governmental function." Given the somewhat muddled state of affairs in this area of our jurisprudence, we believe it is necessary to clarify the "public use" test in order to offer guidance to the trial court on remand and to avoid further confusion on this point in the future. We do so with some trepidation, bearing in mind the warning of Justice Powers that an attempt to give a sufficiently accurate and comprehensive definition of the term "public use" is a "perilous undertaking." *Rutland Ry., Light & Power Co.* v. *Clarendon Power Co.,* 86 Vt. 45, 50, 83 A. 332, 334 (1912). Nevertheless, there are certain common denominators present in our past decisions that can be seen to be essential to any determination of public use.

---

[4] The dissent objects that the Court will not be able to distinguish between public, pious and charitable uses. We merely point out that the Court has had no previous difficulty in making such determinations, even before the articulation of the essential-governmental-function test. See, e.g., *Vermont Wild Land Found.* v. *Town of Pittsford,* 137 Vt. 439, 407 A.2d 174 (1979) (charitable, but not public); *New York Inst. for the Educ. of the Blind* v. *Town of Wolcott,* 128 Vt. 280, 262 A.2d 451 (1970) (both public and charitable); *Fort Orange Council, Inc.* v. *French,* 119 Vt. 378, 125 A.2d 835 (1956) (charitable, but not public). For a discussion of the interrelationship of 32 V.S.A. §§ 3802(4) and 3840 and the test for differentiating between public and charitable uses, see *New York Inst. for the Educ. of the Blind,* 128 Vt. at 284-88, 262 A.2d at 454-56.

## IV.

Before a property is entitled to tax-exempt status as a public use, it must meet certain criteria, as follows: (1) the property must be dedicated unconditionally to public use; (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis. All of the above criteria are explicitly stated or are implicit in the prior decisions of this Court. See, e.g., *Ski-Lan Gymnastics,* 143 Vt. at 297-98, 465 A.2d at 1365 (use of property must confer benefit on indefinite class of persons who are part of public); *Brattleboro Child Dev.,* 138 Vt. at 404-05, 416 A.2d at 154 (same; service must benefit public generally); *Vermont Wild Land Found.,* 137 Vt. at 443-44, 407 A.2d at 176-77 (same; governing consideration is the direct and immediate, rather than the remote or incidental, benefit derived from use of the property); *English Language Center,* 132 Vt. at 329-30, 318 A.2d at 182-83 (indefinite class; service must benefit public generally); *Shelburne Museum,* 129 Vt. at 345-46, 278 A.2d at 722 (property must be primarily devoted to a public use); *New York Inst. for the Educ. of the Blind,* 128 Vt. at 285, 262 A.2d at 454 (primary, as distinguished from an incidental, use of property determines whether it is exempt from taxation; property must be devoted to public use and confer a benefit upon an indefinite class of persons).

All of the litigants seeking tax exemption in the above-cited cases owned and operated their properties on a not-for- profit basis. The requirement of a nonprofit operation does not mean that a property may never operate in the black. It does mean, however, that any excess of income over expenses must be derived incidentally from, and not as a deliberate goal of, the operation, and must be devoted to the public objectives of the project. See *Middlebury College* v. *Town of Hancock,* 115 Vt. at 164, 55 A.2d at 198-99 (income from lumber operations was incidental to primary use of property as a public park, and did not change its tax-exempt status).

Finally, while properties which actually provide essential governmental functions may be exempt as a public use, we no longer will require a property to assume such a burden in order to achieve tax-exempt status. To the extent that our earlier opinions

employ an "essential governmental function" test instead of a "public use" test in determining whether a property is exempt under 32 V.S.A. § 3802(4), those opinions are overruled.[5]

## V.

The trial court's factual findings in the instant case, unfortunately, are insufficient to allow us to apply the above test in order to determine plaintiff's tax-exempt status pursuant to § 3802(4). Therefore, we remand the matter for a new trial.

*Reversed and remanded.*

**Peck, J.,** dissenting. I am unable to agree with the result reached by the majority; therefore, I have no alternative but to dissent.

In construing the word "public" as it appears in 32 V.S.A. § 3802(4) the opinion cites no authority for its result which is, in fact, contrary to the general law established throughout this country by judicial decisions involving organizations of a public nature, as well as the rule requiring the strict construction of tax exemptions *against* the claimant.

On the other hand, the "governmental function" test developed by this Court in our precedential decisions is entirely consistent with general law of long standing. Finally, the majority glosses over the consequences of its decision: the potential for a serious weakening of the tax base of every town, village and city in the state. The above comments summarize the grounds for this dissent; I will explain my objections in greater detail below.

---

[5] Our rejection of the more recent "essential governmental function" standard in favor of the statutorily delineated "public use" test is based in part upon concerns for judicial restraint in "interpreting" legislative actions. The area of tax exemption is a "uniquely legislative concern." *Governor Clinton Council, Inc.* v. *Koslowski,* 137 Vt. 240, 251, 403 A.2d 689, 696 (1979) (Hill, J., dissenting). While we believe that our recent interpretations of 32 V.S.A. § 3802(4) unjustifiably have altered the express intention of the Legislature to allow tax-exempt status for "public uses," our decision in the instant appeal "in no way precludes the legislature from also addressing the subject; it is still free to act. The legislature may ratify, limit or reject our holding." *Hay* v. *Medical Center Hosp.,* 145 Vt. 533, 544-45, 496 A.2d 939, 946 (1985). Thus, should it desire to do so, the Legislature still retains this prerogative.

## I.

Under the rules of statutory construction there is a presumption that the legislature did not intend to use unnecessary language, *In re Parker,* 107 Vt. 463, 478, 181 A. 106, 112 (1935), and that the courts must give effect to every word, clause and sentence in a statute. *Lewis* v. *Holden,* 118 Vt. 59, 62, 99 A.2d 758, 760 (1953). We must, therefore, in construing § 3802(4), give separate and distinct meanings to the three key words "public," "pious" and "charitable" in § 3802(4).

With that requirement as a guideline, there seems to be no reasonable argument to counter the obvious: the plaintiff is neither a pious nor a charitable organization. "Pious," by definition, carries a religious connotation; "charity" and "charitable" relate primarily to the giving of assistance to the needy. Absent statutory definitions, words in a statute are to be given their ordinary meanings. *Vincent* v. *Vermont State Retirement Bd.,* 148 Vt. 531, 535-36, 536 A.2d 925, 928 (1987). Plaintiff does not qualify under either term.

We are left then to consider the meaning of "public" as it is employed by the legislature in the subject statute, and whether, as the majority hold it does, it applies to plaintiff, and thus entitles it to a tax exemption.

One of the clearest shortcomings of the majority opinion is its failure to cite any authority in support of the meaning applied in construing the word "public." This is the key word in this inquiry; the very foundation upon which the entire opinion is based, including the egregious set of standards which make eligible for a tax exemption almost any organization not otherwise covered as pious or charitable. The majority reaches this conclusion by saying it is what the legislature intended. This is out-of-the-hat, unsupported guesswork; it always lies within the power, if not the right, of a court to *say* almost anything in order to achieve a desired result, regardless of its validity.

On the other hand there is, in the general law applicable to situations involving "public" purpose and use, ample authority which indicates strongly, and far more logically than the whimsical construction embraced by the majority, that the legislature, in all probability, intended a meaning, not only consistent with general law, but consistent as well with the "governmental function" test which controlled similar cases until today.

The term or phrase "public use" means a purpose or use, the objects of which are customarily provided by the *government*. See Black's Law Dictionary (5th ed. 1979). It is employed to distinguish like uses commonly left to private interest, inclination or liberality, *id.,* including, presumably, museums, as an almost classical example; in fact, it is difficult to find a better one.

In view of the above, I submit that the "governmental function" test established by this Court in earlier decisions is supported by and entirely consistent with applicable law.

The majority is emboldened to criticize the defendants' position and that of the trial court, both based on prior decisions of this Court, for, in effect, reading into § 3802(4) the words " 'mandated municipal services'. . . [and] 'essential governmental functions.' " Neither phrase, of course, appears expressly in the statute.

This is a strange criticism indeed. The word "public" lacks statutory definition on the one hand, and because some meaning must be assigned, which distinguishes "public" from "pious" or "charitable," the criticized phrases do not constitute a "reading in" in some improper sense; they are, rather, perfectly legitimate exercises in statutory construction, based on the authority of general applicable law. It was left to this Court to define the term "public." This was done and well established over a period of time in prior decisions.

The criticism becomes even more egregious, however, when the majority does exactly the same thing in formulating its own new definition of "public use." As one of the definitional criteria, the majority mandates that "the property must be owned and operated on a not-for-profit basis." The pot has called the kettle black. Where in the statute is there any not-for-profit requirement expressed? In fact, *reading it into the statute,* as the majority does, blurs distinctions between "public," "pious," and "charitable," which the legislature clearly intended, or it would not have used three separate and distinct bases for the exemption entitlement. Nonprofit is characteristic of all three. Under certain circumstances, no distinction at all exists; the majority standards can apply to all three.

## II.

Among the primary concerns to be addressed in the construction of statutes is their effect and consequences. *Town of Cambridge* v. *Bassett,* 142 Vt. 171, 177, 453 A.2d 413, 416 (1982). The potential "effect and consequences" of the majority decision are so appalling that it is inconceivable the legislature could possibly have intended any such result.

The majority glosses over this result without addressing it seriously; in fact it is given only the passing like-it-or-lump-it, let-them-eat-cake comment that, in substance, those dissatisfied can always go to the legislature for a remedy. But this is statutory construction turned upside down. Effect and consequences are among the *first* considerations to be addressed in statutory construction; they are not to be ignored completely except for "oh, by the way, if you don't like the consequences, too bad, the Court has spoken, go see your senator or representative; don't pester us again."

The majority have opened the door to a tax exemption for virtually any and all business which deals with, or is open to, the general public. The opinion concedes that being nonprofit "does not mean that a property may never operate in the black." Moreover, 11 V.S.A. § 2351 is extremely broad in authorizing the organization of nonprofit corporations. It is, in fact, even broader than the types of enterprises expressly listed. The statute qualifies the list with the following statement, immediately preceding the list: "Corporations may be organized under this chapter for *any lawful purpose or purposes,* including, without being limited to, any one or more of [twenty-one specific purposes]." (emphasis added).

It is clear that under the majority decision and the new and novel standards promulgated by the opinion, all that any enterprize, with a few possible exceptions not relevant here, needs to do in order to qualify for a property tax exemption under the "public use" clause, is to make a management decision to organize or reorganize on a nonprofit basis. If the organization, once formed, is opened to all, its property becomes, almost automatically, entitled to an exemption as "public" under § 3802(4). Nonprofit corporations as well as those established for profit are permitted, inter alia, to realize a profit, to retain and pay employees, including high-level management personnel, with commensurate

salaries. A decision to "go nonprofit" may, therefore, be particularly appealing, particularly to a small business or enterprise which would otherwise have to pay its fair share of property taxes to the municipality in which it is situated.

Under the majority-created standards there is nothing to preclude the property of virtually any business, which is open to all members of the public, from being "dedicated to a public use," and the conferring of a benefit, including but not limited to food, clothing, professional services, recreational facilities, and so ad infinitum, on those who avail themselves of the goods or services offered. If a museum can be said to be "public" because it offers a benefit to all, organizations which provide the bare necessities of life are public to an even greater degree. Nor am I aware that charging for the goods or services furnished, including admission to the museums, theaters, athletic events and other recreational facilities, necessarily precludes a designation of property as being dedicated to a public use. No organization can survive on air. Where is one to draw the line?

The door has been opened wide for every fly-by-night enterprise to acquire property and forthwith remove it as a source of revenue for the town in which it is located. This is unjustified, unnecessary, and a most unfortunate result or consequence, which, I am convinced, the legislature never intended.

The majority charges that the governmental function test is too narrow. I disagree strongly. "Public use" is only one of three uses entitled to an exemption under § 3802(4). There are already a great many organizations whose property enjoys an exception as being pious or charitable in nature, or because it falls under one of the other exemptions contained in the same statute. These exemptions are many and beyond any control by, or any input from, the towns or their voters.

It is undisputed that, by far, the major source of revenue for every municipality in the state is the tax imposed on real property. The further effect and consequences of the majority decision is the potential removal from the tax rolls of even more real estate than under our prior decisions. This is seriously detrimental to both the towns and to those remaining taxpayers who cannot claim an exemption.

The burden created by local taxes on real estate is, and for some time now has been, notorious. Every year, almost without

exception, those taxes are increased in order that the towns can continue to fulfill their obligations (many of which are required by the legislature). Studies are ongoing at many levels for ways to relieve the property tax burden, so far with little success; real property taxes continue to increase annually. We should also have in mind that towns must continue to provide police and fire protection, as well as other services, even to those properties and their owners, who pay no share of the taxes which support those services.

The majority opinion imposes still another reason for increasing local taxes. Every time realty is stripped from the tax rolls, the loss must somehow be recouped. Obviously there is only one way to accomplish this: by adding the loss factor to the cost of existing needs and programs (often mandated by the state) and the inflationary costs of municipal services (fire, police, schools, recreational facilities, building maintenance, and others). And where and on whom will this increasing burden be imposed? Of course — on the property owners who cannot avoid ever-increasing taxes through a loop-hole which permits other owners to escape paying a fair share of the municipal burden.

Far from being too narrow, I think any exemption over which the voters have no control or input was *intended* by the legislature to be narrow and should be so construed now, as it was in our prior decisions, and in tax cases generally involving claims for an exemption.

> An exemption [from taxation] will be *strictly* construed *against* the party claiming it, *Trustees of Vermont Wild Land Foundation* v. *Town of Pittsford,* 137 Vt. 439, 444, 407 A.2d 174, 177 (1979), and any doubts as to its application will be interpreted *against* the exemption. *Broughton* v. *Town of Charlotte,* 134 Vt. 270, 272, 356 A.2d 520, 522 (1976).

*In re Northeast Washington County Community Health Center,* 148 Vt. 113, 115, 530 A.2d 558, 559 (1987) (emphasis added). The majority has the same indifference and contempt for this long-standing rule as it does for the added burden its decision loads upon the shoulders of municipalities and their taxpayers.

It is of great concern to me that the majority, with colossal indifference to the public interest and fiscal responsibility, can sit by in its ivory tower, divorced from reality, and blandly increase

the potential for further loss if the revenues upon which the towns must rely, and at the same time add to the burden already faced by the local taxpayers. To shrug off the protections guaranteed to towns and their voters by our precedential decisions is unnecessary and unconscionable. The holdings of this Court which preceded today's decision constituted legitimate statutory construction, and were, moreover, consistent with the established rule quoted immediately above. *Id.* Further, the legislature has acquiesced in these holdings without the slightest indication of demurrer. This tends to confirm the propriety of our prior view of legislative intent. *In re Dixon*, 123 Vt. 111, 115, 183 A.2d 522, 524 (1962). It is all the more persuasive when we consider that the majority's view of intent is virtually the exact opposite. The legislature has been known to respond swiftly to decisions of this Court with which it is dissatisfied.* No such legislative reaction followed our prior decisions.

The majority states that our earlier decisions have created a "somewhat muddled state of affairs in this area of our jurisprudence," and continues with a self-delivered pat on the back, saying it is about to bring order out of chaos by clarifying the whole thing. On the contrary, our preceding recent opinions, interpreting legislative intent, resulted in a clear standard which the majority itself has no difficulty understanding and stating. Today's result, and the rationale which purports to support it, throws the law into a tangle it will take years of litigation and judicial guesswork to straighten out. Extreme and egregious judicial activism has carried the day to the detriment of realty taxpayers, and has done so without citing a single precedent. Muddle "now hath made his masterpiece."

---

* See, for example, 1983, No 201 (Adj. Sess.), recognized as a legislative reaction to this Court's decision in *Soucy v. Soucy Motors, Inc.*, 143 Vt. 615, 471 A.2d 224 (1983), and 1987, No 122 (Adj. Sess.), enacted in response to *State v. LeBlanc*, 149 Vt. 141, 540 A.2d 1037 (1987).