*Studio Place Arts, Inc. v. City of Barre*, No. 247-4-09 Wncv (Bent, J., March 19, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

SUPERIOR COURT                                      CIVIL DIVISION
Washington Unit                                         Docket No. 247-4-09 Wncv

Studio Place Arts, Inc.
        Taxpayer–Appellant

        v.

City of Barre
        Appellee

FINDINGS OF FACT and CONCLUSIONS OF LAW

        In this case, Studio Place Arts, a nonprofit, has appealed an assessment of property tax by the City of Barre. The matter came before the court for trial on December 13, 2012. Studio Place Arts was represented by Robert Gensberg, Esq., and the City of Barre was represented by Oliver Twombly, Esq. The court also viewed the property on January 15, 2013. The court has received proposed findings of fact and memoranda of law. Supplemental memoranda, the last of which was filed on February 21, 2013, were solicited and received.

        Based on the evidence presented, the court finds and concludes as follows.

FINDINGS OF FACT

        1. Studio Place Arts (SPA) is a Vermont nonprofit corporation.

        2. SPA is the owner of a three-story brick building located at 199-201 North Main St. in the historic area of Barre City, Vermont.

        3. SPA was incorporated in 1998. Its articles of incorporation identify its purposes as follows:

        The purpose of SPA is to engage in charitable, cultural, and educational endeavors. SPA seeks to assist and encourage artists and craftspeople and increase the community's access to, and understanding of, art and crafts. Through activities consistent with but not limited to the following, it will be SPA's purpose to:

                1.      provide studio space for artists and craftspeople;

2. promote the arts and crafts by providing display space for creative work which is open for public viewing;

3. provide a venue for workshops and instruction for artists, craftspeople, and members of the general public;

4. provide opportunities for artists and craftspeople to associate, congregate, and interact; and

5. undertake such other charitable, cultural, and educational activities, consistent with the above-stated purposes and with the provisions of Section 501(c)(3) of the Internal Revenue Code or corresponding provisions of subsequently enacted Federal Law, as the Board of Directors may from time to time determine.

4. SPA was designated a 501(c)(3) entity in January 1999.

5. The building at issue was significantly damaged by fire in the early 1990s and, prior to its acquisition by SPA (or its affiliates), it had remained vacant and partially exposed to the weather for multiple years.

6. As a part of SPA's plan for the building, it was acquired by an entity that could use various tax credits for structural renovation, which occurred, and SPA ultimately acquired title in December 2008.

7. The first floor of the building, which is the premier space, is substantially divided in half with one portion being devoted to gallery space and the other portion to classroom space and miscellaneous storage.

8. The second and third floors, which may be accessed by elevator or stairs, are similar in layout as there is a long central corridor on each floor off of which are rooms which are currently being used as studio space for various visual artists. Two spaces contain a collection of art not being offered for sale, but which is owned by a private collector and frequently on display.

9. Most of the visitors to the gallery go upstairs to look at the studios and exhibit space on the second and third floors. The director of SPA, Susan Higby, is usually on duty and has kept track of the visitors. She concludes that about 8,000 people have visited.

10. The studio spaces do not have bathrooms: there is a common bathroom on each floor.

11. Corridor walls on each floor are used as an additional gallery or exhibition space for photographs, paintings, and similar art. Some of the art in the corridor galleries is produced by the resident artists and some by others. Frequently, the displayed art has prices on it but some is listed as not being for sale.

12. Exhibitions in the gallery space are designed by SPA staff from applications made by artists wishing to display their work. Efforts are made to create themed exhibitions. Frequently, the artworks in the gallery are available for sale and have prices on them. Despite the potential for purchase, the purpose of the displays is not for the sale of the art; it is designed as a cultural event or statement and to allow visitors to the building, and students attending classes, to have some connection to the working artists to enhance the public's understanding of the artistic process. This is not necessarily true around the holidays when the gallery contains more "saleable" items. The gallery, as well as the second and third floors, are open to the public five to seven days a week.

13. Seasonally, a schedule of classes and workshops is produced for public attention. These workshops, for example, include classes on portraiture, techniques of Impressionist oil painting, learning how to draw, learning papier-mâché, cartooning, studies in perspective, calligraphy, a decoration, color theory and practice, as well as many other similar topics. Attendees are charged nominal fees for the classes and there have been efforts to provide cost-free classes to various groups such as seniors, disabled teens and adults, inmates, and local young mothers.

14. SPA leases the studio spaces to the artists in residence. The leases are generally for a one-year term and may be renewed. The leases provide the lessee with the right of quiet enjoyment; that is, each lessee may restrict access to the leased premises as he or she determines.

Use of the premises is restricted exclusively as to artists' work, sales of work, teaching purposes, and as a display studio. The lessee is not able to assign the lease nor sublet any portion without prior written consent of SPA. The leases do not require the lessee to keep any particular hours nor is there any obligation on the part of the lessee to interact with the public. For most lessees, the leased studio is the only studio at which the artist works. A number of the artists are full-time artists and are frequently present during the hours that the gallery is open.

The lease does make distinctions between the space rented by the artists and the public space.

15. The open studios are part of SPA's overall plan to educate the public in the creative arts process by allowing attendees to observe artists at work. Despite there being no particular requirements imposed on the tenants by SPA as to open studio times, the

court infers that a significant percentage of the tenant–artists subscribe to the general goal of educating the public in the artistic process and allow the public entry into studio space when they are present. For the artist, this is perhaps a sales opportunity but it is also likely to be a distraction—both a benefit and a hindrance. The problem for the court is that there was insufficient evidence as to how many of the artists actually hold open hours during the times the public has access to the building. Ms. Higgins testified that at least one tenant–artist works nights.

There was no evidence introduced as to how much income any of the artists derives from sales on the premises or how many of the artists were making a living through sales of their work. The artists do have other outlets for sales of their works.

At least during the view, the court did not observe substantial or overt efforts by the artists who were present at the retail promotion of their artwork.

16. Although there are 12 studio spaces, there are 10 leases; some spaces are joined. Occasionally, while the building is open, there are only a few artists with open doors. However, more typically, there are about 5 artists working.

17. Artists are able to lock their doors and maintain their space as private space.

18. It is the intent of SPA to rent space to artists at a price below market rate, although there was some disagreement between the expert witnesses as to whether that was actually occurring. The per-square-foot price for the spaces was between eight and nine dollars. SPA's expert concluded that the rental rate was at approximately market rate; the City's expert concluded that market rate for the rental space would be higher. The court concludes that the rental cost for the space, after taking into account that electricity, heat, water, and trash are provided, is below the market rate, but not by a large degree.

19. A review of the 2011 balance sheet reflects income of approximately $5,000 per year from membership payments; $18,000 per year from sales of artwork; $28,000 from grant income; $46,000 from rental income; $15,000 from tuition income; and $19,000 in miscellaneous income. Sales of artwork from the gallery nets SPA 35% as a commission and, where the director of SPA initiates a sale of artwork from a studio, a 10% commission is payable. Artists selling their own work from their studio do not pay a commission to SPA.

20. SPA publishes a "rack card" which is, in effect, its invitation to a portion of the public. (Exh. 17) That literature sets forth the theme of SPA, which is "Experience our vibrant art center." The language of the advertisement focuses on the experiential aspect of SPA's facility. Phrases such as "experience the art," "experience the artists," and "Explore your own creativity" are the captioned themes. This particular piece of

4

information does not at all touch on the ability to purchase the art. Although there are price tags on the artwork on display, the court finds that the exhibitions are not chosen for the salability of the artwork (except around holidays) but for the artistic merit found by the staff of SPA and how the work fits the theme of the exhibit. SPA has a website and on it appears a section called "call to artists" which advises of the opportunity to show in the gallery and potentially consign the art for sale while it is being shown.

21. The property has significant problems with flooding—7 times it has flooded with more than 4 feet of water in the last 9 years.

22. The City valued the premises at $663,000 for the 2009 tax year, which assessment was timely grieved.

23. The City has concluded that 60% of the property is not taxable because of the "public, pious or charitable uses" exemption at 32 V.S.A. § 3802(4). It has assessed the property at 40% of its value because it concludes that the leased studio space is not exempt.

24. SPA introduced the opinion of Larry Martin, MAI, who concluded the property was worth $370,000 on April 1, 2009. He also concluded that it was worth $360,000 on April 1, 2010 and $340,000 on April 1, 2011.

25. The City introduced opinion evidence of value by Bruce Taylor, also an MAI appraiser. Mr. Taylor opined that on April 1, 2009, the property was worth $485,000, on April 1, 2010 it had a value of $498,000, and on April 1, 2011 it had a value of $500,000.

26. Mr. Taylor and Mr. Martin both used the income approach and market approach to reach their opinions of value. With respect to the income approach, the techniques were very similar: both used the same capitalization rate; the principal difference between the two opinions was the projected market revenue for the property. Mr. Taylor concluded that the income-derived value was $400,000 while Mr. Martin concluded the same was $310,000 (for 2009).

Mr. Taylor concluded that there was $10,000 more in net operating profit than did Mr. Martin, the principal reason for the difference.

27. With regard to the market approach, Mr. Taylor concluded the value to be $570,000 for 2009. Mr. Martin found the market value to be $385,000 for 2009. Both reconciled their two value metrics with Mr. Martin substantially using his market approach and concluding with a value of $370,000; Mr. Taylor averaged the two.

28. The court does not find Mr. Taylor's market analysis at all persuasive in major part because of the comparable properties used. Two of the properties, one in St.

5

Johnsbury and one in White River Jct., sold at prices far outside the range of the subject property—one for $1,900,000 and the other for $1,076,000. They were much larger as well: 26,000 and 15,000 square feet versus 9,300 square feet for SPA's building. Both of these properties also had stable tenants and large amounts of private parking. In short, these two comparables lead the court to suspect that Mr. Taylor's market value was not reliable.

29. Looking at the remaining values, the court finds the range of values to be quite close. The court finds that the correct value for 2009 was $390,000.

CONCLUSIONS OF LAW

With valuation determined, the issue turns to whether, or to what extent, SPA's property is exempt from taxation as a public use. SPA claims exemption under 32 V.S.A. § 3802(4). As it applies to this case, that subsection exempts from the property tax "[r]eal . . . estate granted, sequestered or used for public, pious or charitable uses." In SPA's view, the entire building is dedicated to a public use and thus should be entirely exempt from the property tax. In the City's view, SPA's building is partially dedicated to a public use and should be exempt to that extent only. The City argues that SPA's use of the building for artists' studios is not public in the sense contemplated by the statute. The significant dispute between the parties is not a factual one about the activities undertaken by SPA, or where in the building they occur, but a legal one about how the statute applies to the mix of activities.

The burden of proving that this tax exemption applies and, if so, the extent to which it applies, falls squarely on SPA. "[I]n construing tax exemptions, the burden is on the person claiming the benefit of the exemption, and the exemption statute must be strictly construed against that person." *Our Lady of Ephesus House v. Town of Jamaica*, 2005 VT 16, ¶ 14, 178 Vt. 35 (citations omitted).

The simplicity of the statutory language at issue—"public use"—belies the difficulty of the taxonomical task presented in some circumstances by the case law interpreting § 3802(4). That both parties' positions in this case are understandable and reasonable speaks to this difficulty.

The tax exemption for property dedicated to a public (or pious or charitable) use has been heavily litigated. The lead case is *American Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103 (1989). The case is not particularly significant for its analysis of the facts presented. The trial court ruled that the exemption did not apply; the Supreme Court reversed and remanded due to insufficiency of the findings. Its significance rests instead on its observations about the course of the cases leading up to it. Based on that case law, or some of it, the trial court expressly limited the "public use" exemption to "essential governmental functions." Accepting that prior decisions made

6

the trial court's analysis understandable, the Court clarified that the statute is intended to apply more broadly. See *id*. at 107 ("Considering the previous history of the law in this area of our jurisprudence, it is readily apparent how the trial court came to apply the 'essential governmental function' test to the facts of the instant case.").

The Court emphasized that the purpose of the exemption is to encourage "the performance of service essentially public in nature on the theory that such service benefits the public generally and, in so doing, assumes a share of the public burden." *Id*. at 109 (quoting *English Language Center, Inc. v. Town of Wallingford*, 132 Vt. 327, 329–30 (1974)). The Court reiterated, however, that the purpose is not limited to services that otherwise *would* be provided by the municipality but extends to those "which *should* be encouraged . . . for humanitarian purposes." *Fly Fishing*, 151 Vt. at 109 (quoting *Broughton v. Town of Charlotte*, 134 Vt. 270, 275 (1976) (*Fly Fishing* emphasis removed; new emphasis added). "[T]he crucial factor is the primary use to which the property is put." *Id.* at 108.

The Court then described "certain common denominators present in our past decisions" that help to distinguish tax-exempt public uses from uses that may be of public benefit but are not so enough or in the right manner to warrant freedom from taxation. *Fly Fishing*, 151 Vt. at 109. The common denominators are: "(1) the property must be dedicated unconditionally to public use; (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis." *Id*. at 110. This is no simple test. The Court announced it with "trepidation," acknowledging "the warning of Justice Powers that an attempt to give a sufficiently accurate and comprehensive definition of the term 'public use' is a 'perilous undertaking.'" *Id*. at 109 (quoting *Rutland Ry., Light & Power Co. v. Clarendon Power Co.*, 86 Vt. 45, 50 (1912)).

SPA uses its building for art gallery and classroom space, principally on the first floor but also on the upper floors, and leased studio space on the second and third floors. There is no controversy between the parties that the gallery and classroom space is unconditionally dedicated primarily to a public use directly benefiting an indefinite class of persons who are part of the public. The court has no reason to disagree. During its business hours, SPA's building is open to the public, without selection, free of charge. Classes are free or available for a modest fee and students are not selected in some manner that restricts access to the general public. These uses are intended to enrich the lives of visitors and students by exposing them to, and teaching, art and the artistic process, a humanitarian endeavor. To the extent that the sale of art occurs in the context of these uses, it does so only to an incidental degree. That SPA owns and operates the building on a nonprofit basis is uncontested. Thus, the conclusion that this portion of SPA's activities falls within the meaning of the exemption invites no bedraggling foray into the finer points of the case law.

7

The studio space is different. The studios are privately leased to artists who, while compelled to use the premises for art-related purposes, are free to keep their doors closed, even during normal operating hours if they so choose. The studios are theirs: they are lessees with renewable leases and no real obligation to participate in those of SPA's purposes that directly benefit the indefinite public. At least one of the studios is rented to someone who works only at night when SPA is closed to the public. The nobility of this aspect of SPA's mission (the first listed purpose in SPA's articles of incorporation) is not at issue, but these are not the hallmarks of an exempt public use.

SPA argues that the studios do not exist fully apart from SPA's gallery and classroom uses. Its larger mission is to allow the public to experience art and the artistic process. Having real artists engaging in art on the premises is indispensable to the public's total experience. It allows visitors to view the artistic process on a firsthand basis and engage directly with the artists. The symbiosis to which all three uses are integral, argues SPA, demonstrates that SPA *primarily* uses the *whole* building for a public use that should come within the exemption and any perceived private uses are properly disregarded as incidental.

The problem with SPA's argument is that it outruns the reality demonstrated by the evidence. The lessees are not obligated to integrate with the public in the way SPA describes and, regardless of obligations, SPA has not proven that they do so in a manner and to an extent that shows that the studio use of the building should come within the meaning of the exemption. The private use made of the studio space is far too substantial to disregard it as a mere incident of the exempt public use made of the rest of the building. One might arrive at this conclusion under the conditionality (first) prong of the analysis or the direct benefit/indefinite class (second) prong or, as easily, both. As it applies to these facts, the reasoning in the case law under these prongs tends to overlap. There is no utility in sorting out whether the public use of the studio space is too conditional due to the terms of the leases and related circumstances or the private use simply shows that public benefit is not direct enough. In this case, the inquiries are complementary and the result is the same.

Because the court cannot disregard the private use made of the studios as an incident of exempt public uses (the gallery and classroom space), the court is forced to conclude that SPA has no entitlement to the exemption unless a partial exemption is permissible and appropriate.

The circumstances thus require the court to resolve the knotty question: whether SPA is entitled to no exemption at all or is entitled to a partial exemption. In *Medical Center Hospital of Vermont, Inc. v. City of Burlington*, 131 Vt. 196 (1973), the Court mentioned, but did not rule on, the possibility of a partial exemption where one portion of a property is dedicated to a public use within the meaning of the exemption and another is

not.  See *id*. at 199 (so explaining in circumstances where certain floors of a building corresponded to different uses).  In *Our Lady of Ephesus House v. Town of Jamaica*, 2005 VT 16, 178 Vt. 35, the trial court allocated the exemption generally in the manner contemplated in *Medical Center Hospital*.  The issue (less obviously workable on the facts of the case) was not contested on appeal.  The Supreme Court, noting that it had not addressed the matter since *Medical Center Hospital*, said in a footnote that it would "not decide whether such an allocation was appropriate in this case because no party has contested the decision to allocate."  *Our Lady of Ephesus*, 2005 VT 16, ¶ 32 n.2.  The Court has not addressed the issue since.

SPA argues that the *Our Lady of Ephesus* footnote is tantamount to a ruling that a partial exemption in the public use context of 32 V.S.A. § 3804(4) is impermissible as a matter of law and the statutory language cannot bear such an interpretation in any event.  The City argues that the Supreme Court has permitted partial exemptions throughout the history of the exemption.

The statutory language at issue is the two-word expression "public use."  On its own, neither it nor the contextual statutory language resolves the issue.  Clearly, how the courts apply the exemption is a creature of the case law unconfined by limiting statutory language.[1]  The court takes the language of *Medical Center Hospital* and *Our Lady of Ephesus* at face value.  In neither case did the Court expressly adopt or reject the concept of a partial exemption.  Nor does the court agree with the City that the Court has applied the concept in other cases in a manner that demonstrates that a partial exemption is permitted.  The issue is expressly mentioned in *Medical Center Hospital* and *Our Lady of Ephesus* only.  The cases have left the issue undecided.

The question of partial exemption depends on whether § 3804(4) is interpreted to require exclusivity of public use on the assessed property.  If a taxable property can have but one primary use or all its primary uses must be public uses within the statute, then the concept of a partial exemption is foreclosed.  To some extent, the focus of the inquiry under § 3804(4) on a *primary* public use itself suggests exclusivity.  The case law could be read to imply that among the many uses to which any property may be put, or is put in a particular case, the determinative issue is the character of the use that emerges as primary when the clutter is sifted away.  If that use, the primary use, is not an exempt public use, then the exemption does not apply.  The conditionality and nonprofit prongs

---

[1] Whether courts are well-suited to determine whether a "public use," a vague concept at best, is present on the facts of every next case may be its own dispute.  Clearly, the *Fly Fishing* dissent believed that the majority decision, rather than clarifying anything, eliminated a clear standard, thrust the courts into a perpetual, arbitrary line-drawing exercise, and "throws the law into a tangle it will take years of litigation and judicial guesswork to straighten out." *Fly Fishing*, 151 Vt. at 115, 117 (Peck, J., dissenting).  Invoking Shakespeare, Justice Peck concluded, "Muddle 'now hath made his masterpiece.'"  The majority responded that the Court "has had no previous difficulty in making such determinations" and, in any event, the legislature is free to modify 32 V.S.A. § 3804(4)—and the Court's construction of it—as it sees fit. *Fly Fishing*, 151 Vt. at 109, 111 n.5.  The legislature has never acted.  The broad view of § 3804(4) reflected in *Fly Fishing* and related case law thus prevails and is binding on this court.

9

generally ensure that the exemption will not be used materially, if indirectly, for private gain. Such case law can be read to imply that exclusivity of public use is necessary to warrant freedom from taxation and its lack requires the contrary.

But the case law does not need to be read in that manner. No mental gymnastics are required to observe that the legal expression "public use" is a qualitative conclusion predicated on the character and circumstances of the constituent activities that form the use at issue. That a public use entitled to exemption is nevertheless so despite its private incidents is long-recognized in the case law. It is a practical concession that "public use," in the legal sense, includes an amalgam of various activities and interests. Those activities and interests must be assayed into a primary use to analyze whether, in their totality, they are an exempt public use. The "common denominators" in the case law, isolated by the Court into the *Fly Fishing* test, help to classify uses into a category of genuine public uses that satisfy the purpose of the tax exemption and of those uses that do not. But there may be more than one primary use of a property. It does not always make sense to say that one use is an incident of another. In such cases, if all primary uses fall within the statute, the exemption is obviously appropriate. The issue is whether the exemption might properly apply when one or more, but not all, primary uses fall within the statute. The answer best reflecting the state of the law must be *maybe*.

If the circumstances of a case demonstrate that a portion of an otherwise taxable property warrants the exemption, the exempt portion is reasonably discrete from the nonexempt portion, and extending the exemption to the former does not undermine the reasons for not extending it to the latter, why not allow a partial exemption? In appropriate cases, no such reason is apparent. Permitting a partial exemption when these criteria are met simply allows the legislature's intent, as described in the case law, to be more completely fulfilled and is consistent with the *Fly Fishing* test and the view of the exemption and case law that it represents. The court concludes that, under Vermont law, a partial exemption under § 3804(4) is permissible when the circumstances are appropriate.

The circumstances are appropriate in this case. The facts of this case demonstrate that the gallery and classroom space of SPA's building is a public use squarely within the exemption. The studio space most reflects a private use not within the exemption. These uses are not undifferentiated components of each other physically in the square footage of the building except in immaterial ways. They also are not component uses emerging out of the same activity such that they cannot be treated separately. They are discrete in the sense that they each can be effectively analyzed separately for compliance with the *Fly Fishing* test.

Finally, the nonexempt portion of the building does not contaminate the exempt portion. There is no risk in this case that allowing the partial exemption will reward private use or gain or aid impermissible selection with a tax exemption. The studios

benefit the artist–lessees and SPA receives lease payments in return. SPA's public use of the building does not in any material way provide the private benefits associated with the studios. Nor are the lease payments directly or indirectly part any profit-seeking enterprise. In this case, allowing a partial exemption operates to fulfill, not undermine, the exemption's purpose.

The court does not need to calculate the precise allocation between exempt and nonexempt portions of the building. The City has taken the position that the property is 60% exempt. For purposes of this case, SPA does not contest that allocation. The court accepts this allocation as a stipulation of the parties that, in any event, is reasonable on the evidence presented.

No dispute related to equalization was presented.

## ORDER

The correct value of the property for 2009 was $390,000, subject to equalization according to the law. SPA is entitled to a 60% exemption from the property tax under 32 V.S.A. § 3804(4).

Dated at Montpelier, Vermont on March __, 2013.

_____
Robert R. Bent, Judge