Our Lady of Ephesus House of Prayer v. Town of Jamaica, No. 440-9-02 Wmcv  (Wesley, J., December 2, 2003)


[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


**STATE OF VERMONT**               **WINDHAM  SUPERIOR COURT**
**WINDHAM COUNTY, SS.**            **DOCKET NO. 440-9-02Wmcv**


**OUR LADY OF EPHESUS**          )
**HOUSE OF PRAYER, INC.**        )
       **Plaintiff**
  **VS.**                                       )
                              )
**TOWN OF JAMAICA**                )
       **Defendant**


### FINDINGS OF FACT, CONCLUSIONS OF LAW
### AND ORDER

This matter was heard by the Court on August 11, 2003 on Plaintiff's Complaint for

Declaratory Judgment.  Plaintiff was represented by Christina Reiss Esq.  Defendant was

represented by Robin Stern, Esq.  At the close of the evidence, the Court allowed 30 days for the

filing of proposed findings and conclusions, which have been submitted by each party.

**Procedural History**

Plaintiff brought a similar suit in 2001, seeking a declaration of tax-exempt status for its

real property located in Jamaica, Vt.  The Court issued an opinion and order on August 20, 2001

denying Plaintiff's prayer as to the entirety of the real property, but holding that $38,494 of a

total assessed value of $511,700 qualified as exempt property due to its use as a chapel by a religious society, 32 V.S.A.§3832. Neither party appealed from this declaratory ruling.

In 2002, the Jamaica Listers set Plaintiff's property in the Grand List at $612,000, which was reduced by $38,500 in recognition of the 2001 ruling. The assessment remained unchanged after appeal to the Board of Civil Authority. However, the BCA declined to consider Plaintiff's request for expansion of the portions of the property it claimed as exempt, relying on its conclusion that only this Court has jurisdiction to declare the scope of tax-exemptions. Rather than taking an appeal from the BCA determination, Plaintiff filed a second complaint for declaratory relief.

The Town moved for summary judgment, claiming that all issues sought to be determined by Plaintiff's action had been precluded by the 2001 opinion and order. However, the Court denied summary judgment in an order dated April 30, 2003. Noting that issue preclusion is rarely applied to tax issues, Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591 (1948), the Court concluded that Plaintiff had demonstrated a dispute as to material facts regarding changes in the use of the property since the initial decision. The Court also resolved that Plaintiff was entitled to put forward a new theory for exemption under 32 V.S.A.§3802(4), in reliance on Sigler Foundation v. Town of Norwich, No. 2001-433 (July 26, 2002), which was decided after this Court's 2001 ruling.

The Court takes judicial notice of its earlier findings of fact in Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica, Doc. No. 47-1-01 Wmcv (Aug. 20, 2001), and incorporates them by reference as to all matters relevant to the present proceedings. Some of those findings are repeated below, for ease of comprehension.

2

**Findings of Fact**

1.  Plaintiff is a non-profit corporation organized under Vermont law on Sept. 9, 1997. Pursuant to its Articles of Association, which were unchanged at the time of the hearing, the corporation's purposes include:

> a.  To provide facilities for the personal growth of individuals for reflection and prayer in the Roman Catholic tradition;
>
> b. Upon dissolution, to distribute all assets to the Roman Catholic Diocese of Vermont, Burlington, Vt., its successors or assigns. In the event the Roman Catholic Diocese does not enjoy tax-exempt status upon dissolution, the assets may be designated to another tax-exempt organization, so long as such organization is "in the Roman Catholic tradition".

2.  Plaintiff has been granted tax-exempt status under the Internal Revenue Code because it describes itself as a church. The approval of its 501(c)(3) application, filed on Sept. 27, 1999, specifically relied on Plaintiff's representation that it is not a private foundation because it qualifies as a church under IRS regulations.

3.  Plaintiff represents to the IRS that it became organized as a church because:

> In 1959, Elizabeth Fraser (deceased), mother of one of the incorporators of the church, went to visit the Blessed Mother's last home in Ephesus, Turkey. While she was there praying for her handicapped nephews, the Blessed Mother appeared to her. A special devotion was created to Our Lady of Ephesus, and Our Lady of Ephesus House of Prayer, Inc. was created.

Plaintiff disclaims any written creed or statement of faith, except as set forth in its by-laws, which state:

> i.  Our Lady of Ephesus House of Prayer is a private institution which exists for the purpose of nurturing the spiritual growth and development of all who come into association for religious services, periods of meditation, and spiritual retreats.
>
> ii.  The House of Prayer is founded and named on the evidence of sustained spiritual significance attached to the ancient abode of Mary, Mother of Christ, in

the village by the name of Ephesus, located in the country of Turkey.

4. Schedule A of Plaintiff's 501(c)(3) application further describes Plaintiff's activities as a church, representing that membership is unnecessary, and that the church is open to everyone of all faiths. In support of its application, Plaintiff attached a sample order of worship. It represented that it expected 150 people on average to attend services. In response to a query specifying other religious services which the church would sponsor, Plaintiff indicated that its services would include weddings, stations of the cross, rosary, catechism, and occasional meetings for visiting priests. The church represented that its deacons, ministers and/or pastors would be formally ordained, and that its religious hierarchy or ecclesiastical government would be: "Catholic faith - This church does not have a hierarchy".

5. By deed from Donald and Mary Tarinelli dated April 23, 1999, Plaintiff became owner of 81.7 acres of land in Jamaica, together with the buildings situated upon it. The transfer of real estate was in the form of an unconditional gift to Plaintiff, with no right of reverter to the donors, nor any restriction on Plaintiff's further sale of the property. Mary Tarinelli is currently Plaintiff's Chair and Executive Director, responsible for the day-to-day management of the property. The Tarinellis have been Plaintiff's primary benefactors, whose most significant contributions have consisted of the funds necessary for the payment of property taxes associated with the taxable portions of Plaintiff's real property.

6. The property was subdivided from lands retained by the Tarinellis, consisting of 199 acres on which they maintain their residence. The Tarinellis' house is situated on a hill immediately above and overlooking Plaintiff's property. A private road serves as the common driveway for both parcels. Prior to the bequest, the Tarinellis operated a Morgan horse farm on

4

the premises. As the Court previously found, at the time of the 2001 suit, the property appeared best suited for boarding and raising horses and associated agricultural uses. Of the 81.7 acres, approximately 22.8 acres are fenced fields and pastures. The remaining acreage is wooded, through which runs an extensive network of bridal trails. A portion of the woodlands formerly supported maple-sugaring operations. In 2001, the buildings consisted of a large main barn, a smaller barn, three sheds and an abandoned sugarhouse. At that time, the main barn included a 66 x 100 foot indoor space formerly used as a riding ring and viewing room. The west end of the barn had been converted to a small chapel in which a few church pews had been installed together with other artifacts associated with religious worship. The area devoted to the chapel was found to be approximately 10% of the total area of the barn and former riding ring. The chapel opened onto a small devotional garden, through which a short walk westerly into the woodlands lead to an area in which the fourteen Stations of the Cross had been recreated. The space specifically developed for religious observances comprised a small portion of the 81.7 acres of fields and woodlands.

7. Following the prior proceeding, Plaintiff undertook further renovations in the westerly portion of the main barn formerly used as the indoor riding ring, with the goal of establishing a second larger chapel, adjacent to the smaller chapel described by the 2001 ruling. At the time of the Lister's 2002 assessment, the renovations were incomplete. Subsequently, in early 2003, a heavy burden of snow caused a significant cave-in to the portion of the roof of the main barn covering the riding ring, delaying the completion of the larger chapel. The interior is now substantially complete although insulation and heating remain to be installed. To date, the larger chapel has been used only infrequently. According to Richard Anderberg, past chair of

5

Plaintiff's board, possibly three events have been celebrated in the larger chapel.

8. Since the prior proceeding, pursuant to the permit then in place, Plaintiff has caused the remodeling of former stables into 8 room units, and has permits for the construction of 12 more. These units are served with individual bathroom facilities, for which a mound septic system has been installed. Together with the two upstairs units reserved for visiting priests, the new rooms have resulted in an increase in overnight guests to Plaintiff's retreat facility. The rooms may be reserved through Mary Tarinelli on a first-come, first-served basis. Plaintiff requests a donation of $35 per night for the rooms, which has allowed the organization to become mostly self-sustaining financially, with the exception of property taxes.

9. Mary Tarinelli estimates that with the addition of the second chapel, the renovation of the stalls into rooming units, and the conversion of the indoor ring into an outdoor parking lot, approximately one-half of the main barn is now dedicated to Plaintiff's pious activities. No evidence was presented regarding measurements of the floor area associated with these various functions.

10. One of the largest groups to make use of the facility was the Fraser family reunion in July 2002, when 90 members of Mary Tarinelli's family visited. Preliminary coordination for this event was done by making use of the Lady of Ephesus House of Prayer web site, which included on its menu a "Welcome to the Fraser Family Page" location for receiving information and directions for the reunion, and posting messages.

11. Plaintiff has expanded the publication of its activities through newsletters, postings in public places and newspapers. It also distributes a full-color promotional brochure, and maintains a web-site. Plaintiff emphasizes in these materials that the grounds are always open to

6

the public, outside of the limited schedule of religious services and celebrations. There are now signs on the road directing the public to Plaintiff's facilities

12. In an attempt to better document use of the premises following the 2001 proceedings, Plaintiff has maintained a guest book. Visitors are encouraged to sign, but not required to do so. From April 1, 2001 through March 31, 2002, 50 people signed the registry. From April 1, 2002 through March 31, 2003, 279 visitors signed, including the members of Ms. Tarinelli's family. It is likely that the registry is an inaccurate measure of the use made of the premises, particularly since not all visitors during the larger celebrations, such as the Advent Festival of Lights or the Catholic feast days, are likely to sign. Plaintiff's witnesses estimate that 3000 people have visited the facility since the inception of Our Lady of Ephesus House of Prayer, but this estimate is without other explanation in the evidence.

13. The roof over the riding ring was removed following its collapse, and the space converted to outdoor parking to accommodate visitors. No evidence was offered to apportion the use of the parking space between religious observations and the general use of the premises by members of the public.

14. Plaintiff has no established members, nor is there a congregation associated with the premises. The telephone number listed on Plaintiff's publications is that of Mary and Donald Tarinelli. Board meetings have become more regular since the 2001 proceedings, occurring approximately four times per year. Minutes for such meetings are maintained. However, neither Ms. Tarinelli nor Mr. Anderberg could explain the basis for determining which board members were entitled to vote, and how many such members constituted a quorum. Minutes of the meetings reveal that meetings are rarely attended by more than one-half the members of the

7

Board.  After the 2001 order, Mr. And Ms. Tarinelli authored and delivered to the Board a Statement of Purposes and Goals for the organization indicating that any current members ought to subscribe to the mission statement, or leave the Board.

15.  Mary and Donald Tarinelli have caused the removal of many of their personal possessions, particularly the riding regalia and memorabilia in the viewing room above the riding ring noted by the Court in its 2001 opinion.  The Tarinellis maintain an informal "barter" arrangement by which they pasture their animals on Plaintiff's land, in return for allowing the animals used by Plaintiff in its Festival of Lights access to their pastures.

16.  Notwithstanding some modifications to Plaintiff's activities, as described herein, the evidence still strongly supports the Court's previous conclusion that Mary & Donald Tarinelli retain virtually unbridled discretion with respect to the use of the property, and that they derive a disproportionate benefit in comparison with any other members of the public from its proximity to the adjacent property on which they make their residence.  This conclusion is supported by Mary Tarinelli's dominant role on Plaintiff's board, her authority as executive director in charge of the daily management of all operations - including access to the rooming units.  Furthermore, notwithstanding some increase in the public and pious uses made of Plaintiff's property, it seems apparent that, for the vast proportion of the year, the buildings, pastures and woodlands are largely unused by anyone except the Tarinellis, for whom it serves as an attractive buffer to their substantial remaining real estate holdings.

**Conclusions of Law**

In its previous decision, the Court analyzed Plaintiff's claim in accordance with the

statutory scheme established by 32 V.S.A.§3802(4) and 3832(2). [1] The Court cleaved to well-established principles of statutory construction by which statutes providing for exemption from taxation are to be construed most strongly against those claiming the benefit, although such construction must be reasonable so as not to defeat statutory purposes. The Experiment in International Living v. Town of Brattleboro, 127 Vt. 41 (1968). Finding that Plaintiff's organization as a religious society was undisputed, the Court concluded that it was a close question as to whether *any* of the property was *substantially* dedicated to the furtherance of the organization's purposes. See, Governor Clinton Council, Inc. v. Koslowski, 137 Vt. 240 (1979). Nonetheless, by a preponderance of the evidence, the Court was satisfied that approximately 10% of the large barn was being used for pious purposes as a chapel, together with the small portion of the grounds and woodlands developed as a chapel garden and stations of the cross.

---

[1] 32 V.S.A.§3802(4) provides:
　　The following property shall be exempt from taxation:
　　:::
　　(4) Real and personal estate granted, sequestered or used for public, pious or charitable uses; real property owned by churches or church societies or conferences and used as parsonages and personal property therein used by ministers engaged in full time work in the care of the churches of their fellowship within the state...

32 V.S.A.§3832(2) provides:
　　The exemption from taxation of real and personal estate granted, sequestered or used for public, pious or charitable uses shall not be construed as exempting:
　　:::
　　(2) Real estate owned or kept by a religious society other than a church edifice, a parsonage, the outbuildings of the church edifice or parsonage, a building used as a convent, school, orphanage, home or hospital, land adjacent to any of the buildings named in this subsection, kept and used as a parking lot not used to produce income, lawn, playground or garden, and the so-called glebe lands.

See, Medical Center Hospital of Vermont v. Town of Burlington, 131 Vt. 196 (1973) (only portion of building devoted to exempt use qualifies for exemption). Concluding that 32 V.S.A.§3832 had been enacted as an explicit limit to the exempt uses religious societies might otherwise claim under §3802(4), the Court rejected as inconsistent with the plain language of the statute Plaintiff's claim that the entire property should be exempt as "land adjacent to any of the buildings named in this subsection."

Plaintiff pleads for re-examination of this reasoning, in light of the changes in its use of the property and the expansion of its activities. Plaintiff also urges reconsideration of the Court's application of §3832(2), claiming for the first time that it is *not* a religious society. In the alternative, Plaintiff argues that its use of the property is entirely exempt because the portion of the property not exempt under the Court's previous application of §3832(2) must be considered exempt as a public use under the broader limits of §3802(4). The Court is not persuaded that its earlier construction of §3832(2) was flawed, or that Plaintiff's remaining lands are exempt under §3802(4), or that Plaintiff has established entitlement to a broader exemption as a result of the changes that have transpired since the 2001 ruling.

Although it concedes that portions of its property are dedicated substantially to pious uses, e.g. the chapels, the Stations of the Cross and the living quarters set aside for visiting clergy, Plaintiff now asserts that these uses are *not* subject to the limitations established by §3832(2) because it cannot be concluded that Plaintiff is a religious society. As Plaintiff observes, the term has no statutory definition, and has not been construed by the Supreme Court. Plaintiff proposes a definition which "connotes stronger bonds among its members and stricter entrance requirements that those associated with the rotating board members of a non-profit

10

organization such as OLEHOP."  Plaintiff creatively describes other types of groups that ought to qualify as religious societies under its interpretation, i.e. Jesuits, Benedictines, Sisters of Mercy, Christian Science healers, or fall outside the ambit of legislative coverage, i.e."a religiously motivated group of Jewish people who form an organization to build and operate a museum dedicated to the Holocaust or a religiously motivated group of Mormans who form an organization to recreate Brigham Young's boyhood home complete with a replica of the first church he attended.".  To the extent any ambiguity inheres in the term "religious society", however, the Court cannot but conclude that the Legislature must have intended to include any organization which, as Plaintiff did here, represented itself as a "church"to the Internal Revenue Service.

Plaintiff fares no better as to the newly advanced claim that portions of the property not used for pious purposes are nonetheless exempt under §3802(4) because they are substantially dedicated to a public use.  Even if this claim could be supported as a matter of law, a proposition the Court disputes below, Plaintiff has not established a factual basis to advance it.  By the terms of its articles of incorporation, by-laws and application for tax-exempt status, Plaintiff was established as a church to advance religious and spiritual goals; i.e." to provide facilities for the personal growth of individuals for reflection and prayer in the Roman Catholic tradition", and "for the purpose of nurturing the spiritual growth and development of all who come into association for religious services, periods of meditation, and spiritual retreats".  Plaintiff now contends that while certain areas of the property are clearly dedicated to pious uses, other areas are "devoted purely to 'public' uses (the acreage, the rooms for overnight visitors, the Replica house, the bathroom facilities)", which are "open to the public on a non-denominational basis".

11

Plaintiff also maintains that there "is no comparable property in Town to which the public has unrestricted access other than land which has not been posted and for which permission to enter may or may not be granted according to the wishes of the landowner." Plaintiff's Proposed Findings, ¶¶15&17.

Plaintiff advances these facts attempting to establish that portions of the property are dedicated unconditionally to public use, see American Museum of Fly Fishing, Inc. v. Town of Manchester, 151 Vt. 103 (1989), because the "acreage is necessary and substantially devoted to OLEHOP's central purpose of providing a quiet and peaceful location of great natural beauty to which the public may come to meditate, contemplate and pray." Plaintiff's Proposed Findings, ¶14. Nonetheless, as its written documents or organization clearly show, Plaintiff was *not* formed to advance purely public purposes, nor is it unconditionally bound to do so. No formal statement of purpose establishes the nature and scope of Plaintiff's claim of unconditional dedication to public use; beyond the opening of its religious retreat center on a non-denominational basis to all members of the public, no such "public" purpose arises from Plaintiff's activities. Yet, these activities are inherent in Plaintiff's organization as a church, and have no clearly recognizable separate purpose in advancing a public function.[2]

Apart from the lack of factual support, Plaintiff's reliance on §3802(4) is based on a flawed application of the statutory scheme. As argued by the Town, the limitations imposed by §3832 apply to all public, pious or charitable uses which might otherwise by claimed under

---

[2] Even if Plaintiff were able to claim an organizational purpose to promote the public good separate from its pious goals, the evidence does not establish that the property in question has been substantially dedicated to this purpose. As indicated by the findings, Mary and Donald Tarinelli remain

12

§3802(4).  Indeed, the introductory paragraph to §3832 states "[t]he exemption from taxation of real and personal estate granted, sequestered or used for public, pious or charitable uses shall not be construed as exempting..."  The section goes on to specify in subparagraph two that *all* real estate owned by a religious society is *not* to be exempted, with strictly limited exceptions:" a church edifice, a parsonage, the outbuildings of the church edifice or parsonage, a building used as a convent, school, orphanage, home or hospital, land adjacent to any of the buildings named in this subsection, kept and used as a parking lot not used to produce income, lawn, playground or garden, and the so-called glebe lands".  There is simply no support in §3832 for Plaintiff's contention that real estate owned by a religious society may qualify for exemption under §3802(4) as long as it is used primarily for a public, rather than pious purpose. [3] [4]

the principle users and beneficiaries of Plaintiff's acreage.

[3]  As the Court has previously explained: "The central dilemma plaguing Plaintiff's claim is its failure to acknowledge the legislative purpose underlying §3832(2), which was plainly meant to restrict expansive claims for pious purposes made previously under §3802(4).  This was made explicit by the Supreme Court in In Re Tax Appeal of Abbey Church, 145 Vt. 227 (1984), which overturned the superior court's decree granting tax exempt status to owners of property which was leased to a church:
> The trial court thus interpreted the language of §3832(2) as expanding the scope of §3802(4).  Section 3832, however, was enacted after §3802(4) and limits its scope of application.  Fletcher Farms, supra, 137 Vt. at 584...; In re Aloha Foundation, Inc., 134 Vt. 239, 240 ...(1976).  This intent is clearly apparent from the language of §3832, which states that §3802(4) "shall not be construed as exempting" certain uses.
Id. at 229".  Our Lady of Ephesus House of Prayer v. Town of Jamaica,, Doc. No. 47-1-2001 (Opinion & Order, Aug 20, 2001, pp. 8-9).

[4]  Even if §3832(2) did not preclude Plaintiff's claim for an exemption, the claimed "public use" falls within the limiting strictures of §3832(7), which denies tax exemption for "real and personal property of an organization when the property is used primarily for health or recreational purposes, unless the town or municipality in which the property is located so votes at any regular or special meeting duly warned therefor." In a series of cases spanning almost six decades, the Supreme Court addressed Middlebury College's claim to tax-exemption of a large tract of forest and lands in Hancock, which it claimed to be using for the benefit and enjoyment of the public under a theory similar to the one advanced by Plaintiff here.
> There is no doubt that the so-called Snow Bowl property was "granted" to Middlebury College as a park for the use and benefit of the public.  Middlebury College v. Central

13

As limited by 32 V.S.A. §3832(2), and as the Court determined by its earlier ruling, Plaintiff is entitled only to an exemption for the portions of its property previously identified by the Court as dedicated substantially to pious uses for a chapel, the meditation garden and the Stations of the Cross. Although Plaintiff now claims that the pious uses recognized by §3832(2) have expanded, the Court disagrees. The larger chapel was under construction when the petition for declaratory relief was filed and remains incomplete. Furthermore, it remains unclear whether its use will be sufficient to warrant the conclusion that it is unconditionally dedicated to public and pious purposes. In addition, the Court cannot interpret §3832(2) to cover as a "parsonage" the rooming units occasionally reserved for visiting clergy. The use for this purpose is intermittent, and the rooms are often made available to other members of the public when not used by clergy. Even if they were strictly reserved for clergy, the rooms do not qualify as a" parsonage", a term commonly applicable to the residence quarters of a settled minister or priest. Finally, as predicted by the prior opinion, the Court concludes that the parking lot established on the grounds occupied by the former riding ring does not primarily serve the chapel; rather, it is used indiscriminately for celebrations, and for day and overnight visitors to the grounds,

---

Power Corp., 101 Vt. 325,342...(1928). Therefore, it is clear that, *without more*, the plaintiff would be entitled to the tax exemption it claims. Unfortunately for plaintiff's position, there *is* more; there is 32 V.S.A.§3832. This statute appears on the scene as the nemesis of plaintiff's position and a *deus ex machina* in favor of the defendant.

Standing alone, §3802(4) exempts from taxation all "[r]eal..estate granted, sequestered or used for public...uses," i.e., for public purposes, such as the Snow Bowl land. Nevertheless, §3832, which did not exist in its present form at the time of the 1947 Middlebury College case, *limits* the availability of the §3802(4) public use exemption. Section 3832 provides that the public use exemption "shall not be construed as exempting" certain specific properties. Among these, under §3832(7), are "[r]eal and personal property of an organization...used primarily for...recreational purposes," unless the town votes to grant an exemption.

Middlebury College v. Town of Hancock, 147 Vt. 259(1986); see, also Middlebury College v. Town of Hancock, 115 Vt. 157 (1947).

14

including those who are charged for their accommodations, and thus its use falls outside the scope of the exemption recognized by §3832(2). See, <u>Our Lady of Ephesus House of Prayer v. Town of Jamaica</u>,, Doc. No. 47-1-2001 (Opinion & Order, Aug 20, 2001, p.10 ,fn. 1).

## **ORDER**

For the reasons stated in this opinion, Plaintiff's petition for declaratory judgment is **DENIED**.

Dated December 2, 2003 at Brattleboro, VT.

John P. Wesley
Presiding Judge