Fort Ticonderoga Ass'n v. Town of Orwell, No. 220-9-11 Ancv (Toor, J., Nov. 5, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
ADDISON UNIT
CIVIL DIVISION

| | |
|---|---|
| FORT TICONDEROGA ASSOCIATION, INC.<br>  Appellant<br><br>v.<br><br>TOWN OF ORWELL,<br>  Appellee | Docket Nos. 220-9-11 Ancv<br>221-9-11 Ancv |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is a consolidated tax appeal from the Town of Orwell Board of Civil Authority. Appellant Fort Ticonderoga Association, Inc. (the Association) seeks a declaration that it is exempt from taxation by the Town of Orwell under 32 V.S.A. § 3802(4). On June 25, 2012, the parties filed cross-motions for summary judgment. Both parties filed responses the first week of August. The Association filed a reply on August 20, 2012. Austin D. Hart, Esq. and Timothy D. Connelly, Esq. represent the Association; Robert E. Fletcher, Esq. represents the Town.

Facts

The following facts are undisputed except as noted. The Association is a not-for-profit corporation based in New York and registered in Vermont. Under its bylaws, the activities of the Association "shall be focused on the preservation and interpretation of Fort Ticonderoga and its associated lands, artifacts and structures, as well as the collections, libraries and archives connected therewith so as to facilitate research, documentation and dissemination of information regarding these historic resources for the educational and cultural enrichment of people everywhere."

The Association owns Fort Ticonderoga and surrounding land in New York. It also owns an approximately 113-acre parcel of land in Orwell, Vermont. The parcel is located at Mount Independence, a historic fortification on Lake Champlain that played a significant role in the American Revolutionary War. Mount Independence is listed as a National Historic Landmark on the National Register of Historic Places, and is a notable and well-preserved Revolutionary War site.

The Association's property was originally thought to consist of a 113-acre parcel and a separate 3-acre parcel. The parcels were taxed separately through 2011. As a result, the Association pursued two separate appeals from the Town's assessments of its properties in 2011. Docket No. 220-09-11 Ancv is the appeal for the 113-acre parcel; Docket No. 221-09-11 Ancv is the appeal for the 3-acre parcel. However, it was later discovered, and both parties agree, that the 3-acre parcel is part of the 113-acre parcel, and not a separate piece of property at all. The parties agreed to consolidate the appeal before the court, and in 2012, the Town consolidated the parcels on its grand list for purposes of assessment and taxation.

Mount Independence is located on a peninsula on Lake Champlain. The Association owns the land on the northern half of the peninsula, while the State of Vermont owns the southern half. The Vermont State Division for Historic Preservation operates a historic site, including a visitor's center and museum, on the State's portion of Mount Independence. There is an informal agreement between the Association and the State that allows the State to use and maintain the Association's property as part of the historic site. The State's promotional literature associated with Mount Independence does not distinguish between State and Association land, and the State sometimes leads tours of Mount Independence through Association land. There are historically significant structures all over the mountain, on both State and Association land.

2

Generally speaking, State employees ensure that trails are clear and signs are visible on both State and Association land.

There are two ways to obtain access to the Association's land in Orwell. The first is by water. The second, and more common, is through the State's land on the southern half of the peninsula. When the visitor's center and museum is open – between Memorial Day and Columbus Day each year – visitors over the age of fourteen must pay an entrance fee. Visitors who refuse to pay the fee are denied access to the State's land. In exchange for the fee, visitors may view an orientation film at the center showcasing certain significant aspects of the site. Among the highlights in the film are structures on Association land. Visitors also receive a brochure detailing the trails and historic sites at Mount Independence. The brochure shows no demarcation between the State land and the Association land.

There is a 6.5-mile network of trails on Mount Independence, approximately five miles of which is on Association land. The trail system was constructed in the 1960s in a joint effort by the Association and the State. In total, there are four trails on Mount Independence – the Southern Defences Trail, the Baldwin Trail, the Blue Trail, and the Orange Trail. Only the Blue Trail and Orange Trail extend onto the Association property. The Blue Trail is denoted on the State's brochure as a hiking trail (difficult), while all of the other trails are denoted as walking trails (moderate).

In the State's brochure, historic sites along the trails are identified numerically. On State land, the historic sites are accompanied by fixed interpretive signs that provide visitors with additional information about the sites. On the Association land, signs identify the historic sites by number, and the State brochure provides additional information. The Association plans to install some fixed interpretive sites on its land in the future, but has not yet done so. The

3

character of the trails at Mount Independence varies by location. On the State's portion of the land, the trails are more well-developed and more easily accessible to those visitors who have difficulty with mobility. On the Association land, the trails are more natural, and less well-developed. The difference in character between the trails on State land and the trails on Association land is intentional, based on a master plan developed by the State and the Association in the 1990s.

Visitors who access Mount Independence during the off-season may enter without paying the fee, but do not gain access to the visitor's center and do not receive a brochure. The Association does not charge a separate fee for access to its land, and it does not receive any proceeds from the fees that the State charges. Each year, between 4,000 and 7,000 visitors enter through the State visitor's center. No one tracks how many of those visitors venture onto the Association land, but it is undisputed that visitors to the State land also access the Association land through the joint trail network. No data is available on the number of off-season visitors, or visitors who access the Association land directly by water.

Visitors to Mount Independence use the land, including the Association land, for a number of purposes. Some view the historical remnants, some view the flora and fauna, some hunt during the off-season, and some simply walk the property. Neither party has presented any evidence as to what percentage of visitors partakes in each activity, as such uses are not tracked. The Regional Historic Site Administrator for the agency that manages the State land has observed visitors use the historic site brochures on Association land. There are sixteen sites on the Association land that have archeological remains.

There are three or more seasonal camps located on the Association property owned by third parties. At least one of these camps has a septic system and running water. The owners of

the camps do not own any interest in the Association land, and the Association regards them as "squatters." The Association derives no financial benefit from the camps, and the Town collects taxes from at least one of them.

In 1971, the Vermont Attorney General's Office issued an opinion letter stating that the Association's property in Orwell should be tax-exempt. As a result, the Town did not tax the Association for its Orwell property for approximately twenty years. In 1990, the Town began assessing a property tax for the Association property, and the Association paid that tax. In 2010, the assessed value of the Association's 113-acre parcel was $168,000, and the assessed value of its 3-acre parcel was $39,000. In 2011, the assessed values rose to $591,300 and $71,000, respectively. On June 20, 2011, the Association filed grievances for both appraisals with the Town Board of Listers, claiming it is exempt from taxation under 32 V.S.A. § 3802(4). The Board of Listers issued a decision June 30, 2011, finding that the Association was not entitled to tax-exempt status. The Association then appealed both cases to the Town Board of Civil Authority. The Board of Civil Authority denied the appeals. These appeals followed.

In 2012, the Town consolidated the two parcels on its grand list after discovering that the 3-acre parcel was not a separate piece of land, but was in fact part of the 113-acre parcel. The Town assessed the Association's land at $662,300. The Association filed a grievance with the Town Board of Listers, again claiming tax-exempt status. On May 18, 2012, the listers adjusted the appraised value of the Association's parcel to $597,300, but found that the Association was not entitled to tax-exempt status. In a letter dated June 14, 2012, the Association sought to appeal the decision of the Board of Civil Authority. The Town contends that the Association's June 14 letter was filed too late to constitute a proper appeal, and argues here that the Association has forfeited its right to contest the 2012 assessment of its property.

5

Under 32 V.S.A. § 3802(4), "[r]eal and personal estate granted, sequestered or used for public, pious or charitable uses" is exempt from taxation. An exemption under § 3802(4) is subject to restrictions. Relevant to this case is the restriction that a property is not automatically tax exempt if it is "used primarily for health or recreational purposes." 32 V.S.A. § 3832(7). If the property is used primarily for health or recreational purposes, "there can be no tax exemption without a vote of the town concerned." Ice Center of Washington West, Inc. v. Town of Waterbury, 2008 VT 37, ¶ 5, 183 Vt. 616 (mem.) (quoting In re Aloha Found., Inc., 134 Vt. 239, 240 (1976)).

"[T]he taxpayer bears the burden of establishing its entitlement to a tax exemption." Vermont Studio Center, Inc. v. Town of Johnson, 2010 VT 59, ¶ 7, 188 Vt. 223 (citation omitted). If there is a question as to whether the property is used primarily for health or recreational purposes, "the taxpayer has a double burden: first, to prove exemption under § 3802(4); and second, to show that the exemption is not limited by § 3832(7)." Ice Center, 2008 VT 37 at ¶ 5 (citation omitted). Additionally, an exemption "is strictly construed against the taxpayer, and any doubts as to its application will be interpreted against the exemption." Id. at ¶ 4 (quotation omitted).

To claim tax exempt status under § 3802(4), a taxpayer must prove the following:

> (1) the property must be dedicated unconditionally to public use; (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis.

American Museum of Fly Fishing, Inc. v. Town of Manchester, 151 Vt. 103, 108 (1989) (hereinafter Fly Fishing). Of the three criteria for meeting the exemption, the Town contests

only the first two. Additionally, the Town argues that even if the Association can meet the Fly Fishing criteria, the primary use of the property is recreational.

I.    Dedication to Public Use

Under the first prong of the Fly Fishing test, the Association property must be "dedicated unconditionally to public use." Fly Fishing, 151 Vt. at 110. This does not mean that member of the public must physically *use* the property; rather, the property must be put to some primary use that benefits the public. *See*, *e.g.*, Institute of Professional Practice, Inc. v. Town of Berlin, 174 Vt. 535, 538 (2002) (mem.) (Noting that offices used by a charitable organization "for purposes directly connected with the running of" the organization are exempt from taxation.) (quotation omitted). The benefit the public derives from using the property must be "direct and immediate, rather than remote or incidental." Kingsland Bay School, Inc. v. Town of Middlebury, 153 Vt. 201, 205 (1989) (quotation omitted).

First, the Town argues that the Association's involvement at Mount Independence is passive, and that its contribution to the preservation of the historic site is limited to holding its lands open to the public. The Town argues that it is the State that operates, maintains, and informs the public about Mount Independence, and that the Association's lack of involvement signifies that it has not dedicated its land to public use. Relatedly, the Town asserts that the Association's failure to actively promote programs or events on its property signifies that the land is not dedicated to public use.

The Vermont Supreme Court confronted a similar argument in Twin Valley Community Services, Inc. v. Town of Randolph, 170 Vt. 648 (2000) (mem.). In that case, the property was owned by a non-profit corporation whose sole mission was to further the purposes of its lessee, another non-profit corporation. The Court found that because "[b]oth the taxpayer-owner and

7

the lessee-operator are nonprofit corporations with a single mission," the lessee's operation of the property did not bar the property owner from claiming tax exempt status. Id. at 650. Twin Valley is controlling here. To the extent that the State utilizes the Association's land at Mount Independence for public benefit, such utilization does not defeat the Association's claim of tax exempt status. Both entities are dedicated to the preservation of Mount Independence, and act together to further a single mission, much like the entities in Twin Valley did.

Similarly, the fact that the Association does not actively promote programs or events on its half of Mount Independence is not a bar to its claim of tax exempt status. The State promotes programs, events, and public awareness about the entirety of Mount Independence, including the Association land. It is clear from the record that the State treats Mount Independence as one historic site, available to the public in its entirety:

> [B]oth entities are helping to preserve and protect this nationally significant resource and making it available to the public, because it's important for us to know our history . . . . [I]t helps us tell the whole story of Mount Independence. The historic, or the, the fortification is very complex and has, the engineering makes great use of the natural resources and the topography. So by being able to make the whole of Mount Independence available, the public can see for themselves the whole story. If the Mount was cut in half, that would only tell half the story.

Deposition of Elsa Gilbertson, Regional Historic Site Administrator for the Vermont Division for Historic Preservation at 34:11-25, June 12, 2012. Just as the lessee-operator dedicated the taxpayer's property to public use in Twin Valley, the State dedicates the Association's property to public use here.

Next, the Town argues that the Association property is not dedicated to public use because many of its visitors enter through the State's property on the southern half of the peninsula, and the State's property is only open seasonally and requires a fee for entry. The State-run visitor's center is open from Memorial Day to Columbus Day each year, for eight

8

hours per day. Additionally, visitors aged fifteen or older must pay an entrance fee when the visitor's center is open.

Initially, the court notes that it is possible to access the Association's land by water without crossing State land. Additionally, visitors may access the Association's land through the State's land during the off-season without paying a fee. However, to the extent that visitors access the Association's land through State land, the fact that the State charges an entrance fee is not a barrier to the Association's claim of tax exempt status, especially considering that the Association receives no portion of the entrance fee. *See generally* Fly Fishing, 151 Vt. at 110 ("The requirement of a nonprofit operation does not mean that a property may never operate in the black."); 71 Am. Jur. 2d State and Local Taxation § 281 (noting that a charitable organization may charge a fee without losing tax exempt status). Similarly, the fact that the visitor's center is only open seasonally does not defeat the Association's claim of tax exempt status. *See, e.g.*, Green Acre Baha'I Institute v. Town of Eliot, 150 Me. 350, 353 (1954) ("Exemption is not defeated by the fact that the use by the charitable institution for is own purposes is seasonal.").

Finally, the Town argues that the lack of detailed signs on the Association property make it difficult for visitors to appreciate the historical significance of the property without a brochure provided by the State. Currently, the historical points of interest on the Association land are identified with numbered signs; a visitor with a brochure can match the number on the sign to a description in the brochure. The Town argues that during the off-season, the Association's land is no different than any other piece of land in the state that is not posted, because visitors cannot appreciate the historical significance of the land without the brochure.

Visitors to the Association's land during the off-season could certainly bring a brochure kept from a previous visit, or have independent knowledge of the significance of historical sites

9

at Mount Independence.[1] Additionally, to the extent that off-season visitors have no prior or independent knowledge of the historical significance of sites on the Association's land, it does not necessarily follow that the land is not dedicated to public use during those months. Regardless of whether visitors understand the specific back story of a historical artifact, they are generally aware that they are viewing a piece of Revolutionary War history, and can "see what the thing is and use their imaginations."[2] Gilbertson Dep. 84:20-21, June 12, 2012.

Together with the State Division for Historic Preservation, the Association has committed its property to public use. The Association allows the public to freely access its property and the historic sites therein, and works together with the State to allow the public to view and learn about the history of Mount Independence. Such a use is consistent with unconditional dedication to public use. For that reason, the Association has met its burden under the first prong of Fly Fishing.

## II.    Benefit to an Indirect Class of Persons

Under the second prong of the American Fly Fishing test, the property must "directly benefit an indefinite class of persons who are part of the public," thereby conferring a benefit on society. Fly Fishing, 151 Vt. at 110. The Town argues that for a number of reasons, the Association property serves too few individuals to confer a benefit on an indefinite class of persons. There is very little data available in the record to show the number of individuals who utilize the Association property each year. Somewhere between 4,000 and 7,000 individuals visit the State portion of Mount Independence when the visitor's center is open each year, but it

---

[1] Indeed, it would seem logical that at least some of the visitors to Mount Independence have an interest in Revolutionary War history such that they do not need a brochure to know the historical significance of artifacts on the Association land.

[2] This assumes, of course, that the visitors are using the Association land as a result of interest in its historical significance, and not for recreation. The court addresses the Town's argument that many of the Association's visitors use the land for recreational purposes below.

is unknown how many of them enter Association land. It is similarly unknown how many individuals enter Mount Independence during the off-season, or access the Association land directly by water. The Town points to the lack of available data, combined with the difficulty of accessing the Association land,[3] as evidence that it does not confer a benefit on an indefinite class of persons.[4]

"The indefinite-class-of-persons test is intended 'to distinguish uses that benefit the public from uses that benefit only a selected few.'" Vermont Studio Center, Inc. v. Town of Johnson, 2010 VT 59, ¶ 8, 188 Vt. 223 (quoting Sigler v. Town of Norwich, 174 Vt. 129, 134 (2002)). In other words, the focus is not on the *number* of beneficiaries, but rather the extent to which the property is only available to a discrete segment of the public. In Vermont Studio Center, the Vermont Supreme Court found that the property did not benefit an indefinite class of persons, because "[t]hose who seek to benefit from the use of VSC's property must file an application, and VSC exercises sole discretion in determining who qualifies." Id. at ¶ 12. Similarly, the Court held in Trustees of Vermont Wild Land Found. v. Town of Pittsford that where "use of the property is restricted to a limited number of students and researchers at the college level," no direct benefit is conferred on society. 137 Vt. 439, 444 (1979).

This case is not like Vermont Studio Center or Vermont Wild Land. While it may be true that a fairly small number of individuals access the Association's land each year, those individuals are part of society at large, not a discrete segment of society. There is no application

---

[3] The Town argues that the natural condition of the trails on the FTA land makes it less accessible than the State land, and thus signifies that the FTA land does not confer a benefit on an indefinite class of persons. The accessibility of the trails on FTA land or lack thereof does not bear on whether the land is open to the public as a whole, or to a select few individuals.

[4] The Town also points to the fact that portions of the trails on Association property were washed out due to storm activity in the relevant tax year. The court does not find such temporary conditions to be relevant to the issues before it.

or screening process in place to determine who may gain access to the Association property. The Association lands are held open to all members of the public, not just a "selected few." For that reason, the Association has met its burden under the second prong of the Fly Fishing test.

### III.    Recreational Use

Although the Association has met the criteria set forth in Fly Fishing for public use, it cannot claim tax exempt status unless it meets its burden of showing that the property is not "used primarily for health or recreational purposes." 32 V.S.A. § 3832(7). If the primary use of the land is recreational, there can be no tax exemption without a town vote. *See* Ice Center, 2008 VT 37 at ¶ 8 (finding that because "the facility is primarily dedicated to recreation . . . even if the Ice Center cleared the hurdle of § 3802(4), an exemption would still be unavailable under § 3832(7).").

It is not dispositive that the land in this case is owned by a non-profit entity dedicated to educating the public. Shelburne Museum, Inc. v. Town of Shelburne, 129 Vt. 341, 344 (1971) ("That both of the subject properties are owned by a corporation dedicated to charitable purposes does not establish their exemption."). Rather, the Association must show that its ownership of the land is dedicated to "the appropriate use and benefit of the institution . . . in carrying out the purposes of its incorporation." Willard v. Pike, 59 Vt. 202, 218 (1887). "The governing consideration is the direct and immediate benefit derived from the use of the property, rather than the remote or incidental benefit produced by its primary function." Shelburne Museum, 129 Vt. at 341.

The Town has proffered some evidence that visitors use the Association property for recreational purposes. The Town posits that during the off-season, "[i]t is entirely possible that [visitors] are there simply to walk to the land, to observe flora and fauna, to bird watch or to

12

picnic, swim, fish or hunt." Such uses are consistent with those observed by Elsa Gilbertson, the State Regional Historic Site Administrator responsible for Mount Independence. Additionally, there are at least three seasonal camps on the Association property, at least one of which has a septic system and running water. The Town points to the camps as additional evidence that the primary benefit derived from the use of the property is recreational, rather than educational.

The Association acknowledges that some visitors may use the property for recreation purposes, but characterizes those uses as incidental benefits conferred as a result of the property's primary function as a historical site. Additionally, the Association asserts that it regards the owners of the seasonal camps as squatters, but permits their occupation of the land as part of its open land policy. The Association argues that the camp owners' use of the land is incidental, rather than primary. The court agrees. The existence of the camps does not defeat tax-exempt status for the whole parcel. 32 V.S.A. § 3802(4)("private buildings on such lands shall be [taxable] to the owners thereof.").

The undisputed facts show that the Association land is an integral part of Mount Independence. Both the State and the Association treat Mount Independence as a single historic site, whose primarily use and purpose is to preserve historic artifacts and inform the public about American history. It is undisputed that visitors use the historic site brochure on the Association land, and there is no demarcation between State and Association land in the brochure. On a practical level, as opposed to a theoretical one, the two sites are treated as one by the State, the Association, and the public. As with any large piece of land held open to the public, some use is inevitably recreational in nature. However, there is nothing in the record to suggest that the *primary* use of the Association land is recreational in nature, or even that those using the site recreationally are not also using it as a historic site. What evidence exists about recreational use

13

is vague and undefined. There is no evidence at all that recreational use outweighs the clear and undisputed use of the property as a historic site. Because the facts show that the primary purpose and use of both Mount Independence and the Association land is not recreational, the Association has met its burden and 32 V.S.A. § 3832(7) is not a bar to tax-exempt status.

## IV.    The 2012 Assessment

Finally, the Town argues that the Association did not properly appeal its 2012 tax assessment, and that even if the Association proves that it is entitled to tax-exempt status, that status is limited to 2011.  Because the appeals before the court relate only to the 2011 tax assessment, the court does not reach this issue.

## Order

The Association's motion for summary judgment is granted.  The Town's motion for summary judgment is denied. The court does not reach the question of the 2012 tax year. The Association is directed to submit a proposed judgment, to which the Town shall have ten days to object.

Dated at Middlebury this 5th day of November, 2012.

_____
Helen M. Toor
Superior Court Judge

14