2010 VT 59

## Vermont Studio Center, Inc. v. Town of Johnson

[5 A.3d 904]

No. 09-361

Present: Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Crawford, Supr. J., Specially Assigned

Opinion Filed July 2, 2010

*Charles L. Merriman* of *Tarrant, Marks & Gillies*, Montpelier, for Plaintiff-Appellant.

*David A. Barra* of *Unsworth & Barra, PLC*, Essex Junction, for Defendant-Appellee.

*William H. Sorrell*, Attorney General, and *Suzanne M. Monte*, Assistant Attorney General, Montpelier, for Amicus Curiae State of Vermont.

¶ 1. **Burgess, J.** In this appeal, we must decide if real property owned by Vermont Studio Center, Inc. (VSC) is exempt from property tax under 32 V.S.A. § 3802(4). VSC maintains that its real estate is put to a "public use" and that it is therefore entitled to an exemption. The superior court rejected this argument and granted summary judgment to the Town of Johnson. We affirm.

¶ 2. The following facts are undisputed. VSC is a nonprofit corporation that owns real property in the Town of Johnson. VSC's property is primarily used for an artists' residency program, and the direct beneficiaries of this program are artists, writers, printmakers, and photographers. Approximately 2000 individuals apply annually for 612 four-week residencies, and there are approximately fifty visual artists and writers on site each month. VSC restricts the number of residencies it offers primarily due to limited funding and space. Those who wish to participate

must submit an application that includes a $25 application fee, a portfolio of their work or a manuscript, a current resume, and three references. A jury reviews these applications and selects participants. Participants are charged $3750 for a four-week residency, although most seek financial aid.

■ ¶ 3. Based on these facts, VSC claimed a tax exemption under 32 V.S.A. § 3802(4), which exempts from taxation "[r]eal . . . estate . . . used for public . . . uses." To be entitled to an exemption under this provision, VSC needed to show, in part, that the primary use of its property directly benefited "an indefinite class of persons who are part of the public," and also conferred "a benefit on society as a result of the benefit conferred on the persons directly served." *Am. Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 110, 557 A.2d 900, 904 (1989). The town listers determined that VSC did not satisfy these requirements, and the town board of civil authority agreed. VSC then appealed to the superior court, which reached a similar conclusion.

¶ 4. In reaching its conclusion, the superior court looked to our decision in *Sigler Foundation v. Town of Norwich*, 174 Vt. 129, 807 A.2d 442 (2002). In that case, it was determined that a state-of-the-art dairy farm, established to demonstrate and advance modern farming techniques, owned by a charitable foundation, and open to the general public, provided a direct benefit to an indefinite class of persons. VSC maintained that just as the *Sigler* beneficiaries shared an interest in dairy farming, its beneficiaries shared an interest in the arts, and this should not preclude them from being considered an indefinite class. Additionally, it argued that its beneficiaries, selected from applicants worldwide, were even more varied and diverse than those in *Sigler*. The superior court found that while VSC's arguments might be narrowly true, they overlooked *Sigler*'s directive that "[t]he broader the scope of an organization's beneficiaries, and less restrictive its criteria, the greater the likelihood it is engaged in providing uses for an indefinite class of persons." *Id.* at 134, 807 A.2d at 447. The court recognized that a property owner could be entitled to a tax exemption notwithstanding its use of an application and selection process, but found that such restrictions nonetheless weighed heavily against such a finding.

¶ 5. Unlike *Sigler*, the court explained, VSC's property was not open to the public at large and, in fact, VSC turned away

members of the public. Moreover, VSC chose its beneficiaries through a juried application process, and the "direct beneficiaries" of the selection process were artists — a definite class. The court rejected VSC's argument that the specific persons who received benefits and support from VSC could not be "identified, determined, or defined." *Id.* at 131, 807 A.2d at 444 (quotation marks omitted). To the contrary, the court found that they were defined each year through VSC's exercise of its "choice, selection, or judgment." *Id.* at 134, 807 A.2d at 447. For this and other reasons, the court found that VSC failed to sustain its burden of establishing its entitlement to a tax exemption under 32 V.S.A. § 3802(4), and it granted summary judgment to the Town. VSC appealed.

¶ 6. VSC argues that the trial court misinterpreted our case law in reaching its decision. According to VSC, its selection process does not meaningfully narrow the scope of its beneficiaries under this Court's holding in *Sigler*. VSC asserts that it serves the needs of a subpopulation of the general public, and this Court has previously upheld tax exemptions for organizations that serve core social or aesthetic needs of discrete subpopulations. VSC states that it must limit the public's access to its property solely due to space and that the trial court wrongly found that its beneficiaries constituted a "closed circle or group determined by VSC's choice or selection."

¶ 7. Our review is de novo, *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 309, 683 A.2d 386, 389 (1996), and we affirm the trial court's decision. As the parties recognize, the taxpayer bears the burden of establishing its entitlement to a tax exemption under 32 V.S.A. § 3802(4). *Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica*, 2005 VT 16, ¶ 14, 178 Vt. 35, 869 A.2d 145. Additionally, exemptions are strictly construed against the taxpayer, and "any doubts as to its application will be interpreted against the exemption." *Ice Ctr. of Wash. W., Inc. v. Town of Waterbury*, 2008 VT 37, ¶ 4, 183 Vt. 616, 950 A.2d 464 (mem.) (quotation omitted).[1]

---

[1] It is true, as the dissent posits, that the meaning of the term "public use" has been fleshed out through our case law, and there is little statutory language to be construed. Nonetheless, the Court is bound to construe tax exemptions strictly against the taxpayer lest all taxpayers be burdened with the costs of conferring a benefit to select individuals rather than to the public at large. See, e.g., *Delta Psi*

¶ 8. As stated above, to constitute a "public use," the primary use of the property must directly benefit "an indefinite class of persons who are part of the public." *Am. Museum of Fly Fishing*, 151 Vt. at 110, 557 A.2d at 904. The indefinite-class-of-persons test is intended "to distinguish uses that benefit the public from uses that benefit only a selected few." *Sigler*, 174 Vt. at 134, 807 A.2d at 447; see also *Trs. of Vt. Wild Land Found. v. Town of Pittsford*, 137 Vt. 439, 443, 407 A.2d 174, 176 (1979) (noting that the critical distinction under § 3802(4) "is between a private or limited, and a general or indefinite, benefit"). To determine if this requirement is satisfied, we consider "the character and quality" of the criteria that an organization uses to determine its beneficiaries. *Sigler*, 174 Vt. at 134, 807 A.2d at 447. As the trial court recognized, "[t]he broader the scope of an organization's beneficiaries, and less restrictive its [decision-making] criteria, the greater the likelihood it is engaged in providing uses for an indefinite class of persons." *Id.*

¶ 9. Contrary to VSC's assertion, *Sigler* does not stand for the proposition that if "services are offered openly to a broad spectrum of society," and an organization uses fair and impartial criteria to determine its beneficiaries, then the class directly served is necessarily "indefinite." The land at issue in *Sigler* was "open to the public at large," *id.* at 135, 807 A.2d at 447, and the foundation imposed *no* restrictions on access and use. While the bulk of the beneficiaries could be identified as persons interested in dairy farming, the foundation had "never turned anyone away." *Id.* We thus concluded that the foundation's primary use of the property benefitted an indefinite class of persons.

¶ 10. We reached a different conclusion in *Vermont Wild Land*. In that case, a foundation owned an undeveloped section of wilderness and made the land available for scientific research. Public access to the property was strictly controlled so as to keep it wild, and entrance was by permission only. The foundation decided who could enter the land, and decisions were made on the basis of applications, the requirements of which were fairly

*Fraternity v. City of Burlington*, 2008 VT 129, ¶ 14, 185 Vt. 129, 969 A.2d 54 (recognizing that "the right to hold land without being subject to taxation may constitute a substantial detriment to the affected locality and a significant advantage to the landowner" and that land use "ought not to result in exemption from taxation absent the conferral of a substantial public benefit such as the tax exemption law was designed to foster" (quotation omitted)).

extensive. Anyone engaged in science, education, or research would almost always receive permission automatically, but an alleged scientific purpose did not guarantee admission. Additionally, the foundation did not publicize the land's availability, the property itself was unmarked, and would-be visitors needed to call in advance, although the foundation's telephone number was not published.

¶ 11. Based on these facts, we concluded that the foundation's property was not put to a "public use" under 32 V.S.A. § 3802(4). "[T]he immediate benefit from the use of the property" was restricted to a limited number of individuals, and the foundation controlled and determined who could enter the land. *Vt. Wild Land*, 137 Vt. at 444, 407 A.2d at 177. Thus, because "the beneficiaries of the use of the land [were] restricted to a small, select number" of individuals chosen by the foundation for "their own reasons," the property was not being put to a "public use." *Id.*

¶ 12. The same holds true here. Those who seek to benefit from the use of VSC's property must file an application, and VSC exercises sole discretion in determining who qualifies. The fact that the application process is open "to the entire world" is of no moment. Certainly, the same can be said for the applicants in *Vermont Wild Land.* What is significant is the existence of VSC's screening process and the restrictions it imposes on those who can benefit from the primary use of the property. This is the hallmark of a "private" as opposed to a "public" use.[2] See *Sigler*, 174 Vt. at 134, 807 A.2d at 447 (recognizing that unlike "public uses," private uses of property "are characterized by the benefits bestowed on a particular, and most often, limited sector of the public usually

---

[2] We are not persuaded, as the dissent is, that the use of VSC's property provides a direct benefit to the general public simply because anyone can apply to VSC even though only skilled artists will be accepted. *Post,* ¶ 27. Where the use of property "directly promotes individual interest, although it may also tend incidentally to the public benefit," it "is essentially a private, and not a public, activity." *Vt. Wild Land,* 137 Vt. at 444, 407 A.2d at 177 (quotation omitted). The fact that the public at large can seek, but rarely gain, the benefit offered by VSC does not serve the legislative goal of "public use." See *Sigler,* 174 Vt. at 134, 807 A.2d at 447 ("Public uses are characterized as such, in part because of the breadth and scope of the users who need not, as a prerequisite to availing themselves of these uses, belong to any exclusive group.").

distinguishable by certain characteristics or membership").[3] VSC's beneficiaries share a proficiency in the arts (as measured by VSC), and those who benefit from the operation of the artist-in-residence program are "finite and limited." *Id.*

¶ 13. VSC mistakenly relies on *Fort Orange Council, Inc. v. French*, 119 Vt. 378, 125 A.2d 835 (1956), and *Experiment in International Living, Inc. v. Town of Brattleboro*, 127 Vt. 41, 238 A.2d 782 (1968), to establish that its beneficiaries are not part of a "closed circle or group." *Fort Orange* held that land owned by the Boy Scouts of America and used as a boy scout camp was not entitled to a tax exemption under 32 V.S.A. § 3802(4). That conclusion was based on the fact that the land was used "exclusively for the benefit of its members and not for the benefit of the public at large." 119 Vt. at 383, 125 A.2d at 838.

¶ 14. We reached a similar conclusion in *Experiment in International Living*, holding that certain land used as a training facility for the Peace Corps and other organizations was not tax-exempt. The decision in that case did not turn on the mere fact that the owner of the property contracted with outside organizations, as VSC suggests. Instead, like *Fort Orange*, the benefits of the use of the property were not conferred on "an indefinite class of persons who [were] a part of the public," but rather were conferred on a definite class of persons selected by an organization to receive the benefits. *Experiment in Int'l Living*, 127 Vt. at 48, 238 A.2d at 786, *overruled on other grounds by Am. Museum of Fly Fishing*, 151 Vt. 103, 557 A.2d 900. While VSC's beneficiaries may not be members of VSC's organization, as in *Fort Orange*, they are selected by VSC based on specific criteria developed by VSC, just like the beneficiaries in *Experiment in International Living*.

---

[3] Selection, per se, is not alien to the legislative scheme of tax exemption. However, where the Legislature intended to exempt selective uses of property, such as property used by organizations whose membership is restricted, by entities that employ competitive admissions criteria, or property for special objectives, it has done so expressly. See, e.g., 32 V.S.A. § 3802(2) (veterans), (4) (colleges, academies, or other public schools), & (15) (animal shelters). VSC does not claim it is entitled to the benefit of any such specific exemptions. Again, given "our practice of construing tax exemptions strongly against those who claim the exemption," *Delta Psi Fraternity*, 2008 VT 129, ¶ 14, these specific provisions inform our conclusion that VSC is not putting its property to a "public use" contemplated by the statute. Cf. *post*, ¶ 26.

¶ 15. Certainly, an organization need not actually serve "every member of the community" to be entitled to a tax exemption under § 3802(4), but the benefits conferred nonetheless "must be upon the public at large, or an indefinite part of such public, rather than a closed circle, or group determined by choice or selection." *Vt. Wild Land*, 137 Vt. at 443, 407 A.2d at 177 (quotations omitted). As we emphasized in *Vermont Wild Land*, in cases like *Experiment in International Living*, where beneficiaries are restricted "to persons selected by a particular organization," a tax exemption will be denied because the service provided is "not essentially public in nature." 137 Vt. at 443, 407 A.2d at 177 (quotation omitted). This serves the legislative purpose of the statute, which is "to benefit the community as a whole by benefitting that indefinite part of the public served by public . . . organizations." *Sigler*, 174 Vt. at 134, 807 A.2d at 446 (quotation omitted); see also *Lincoln St., Inc. v. Town of Springfield*, 159 Vt. 181, 185, 615 A.2d 1028, 1031 (1992) (stating that where the benefit of tax exemption under § 3802 flows "to private individuals . . . rather than to an indefinite class of persons who are part of the public, the use is not public, the purpose of the statute is not met, and the town cannot be required under the statute to exempt the property from taxation.").

¶ 16. The trial court properly concluded that VSC's primary use of the property did not directly benefit "an indefinite class of persons who are part of the public." Summary judgment was therefore appropriately granted to the Town. Given that conclusion, there is no need to address VSC's argument that the court erred in evaluating a different portion of the "public use" test set forth in *American Museum of Fly Fishing*.

*Affirmed.*

¶ 17. **Crawford, Supr. J.**, Specially Assigned, dissenting. I dissent from the majority opinion because in excluding from tax-exempt status any arts organization which makes use of an open competition to select participants in its programs, the majority unduly restricts the statutory exemption for "[r]eal and personal estate . . . used for public, pious or charitable uses." 32 V.S.A. § 3802(4).

¶ 18. The substance of the statutory exemption has developed exclusively through case law. The legislative language tells us almost nothing about what constitutes a "public use" except that

lands used for purposes such as schools and libraries are specified as tax-exempt. In the case of real estate used for other public purposes, it has fallen to this Court to give shape and definition to the exemption.

¶ 19. Two cases show the way. In *American Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 557 A.2d 900 (1989), the Court rejected prior decisions which equated public use with the fulfillment of essential governmental functions. The Court substituted a more inclusive three-part test, including the requirement that "the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served." *Id.* at 110, 557 A.2d at 904. A museum devoted to the history of fly fishing would be unlikely to fulfill any essential governmental function, but it could benefit the group of people interested in the sport and, by educating and informing that relatively small group, it could be said to benefit the public as a whole.[4]

¶ 20. In *Sigler Foundation v. Town of Norwich*, 174 Vt. 129, 807 A.2d 442 (2002), the Court refined its definition of an "indefinite class of persons." The Sigler Foundation operated a five-acre model dairy farm (the "Dream and Do Farm"), which was open for school field trips and dairy researchers as well as to members of the public. The decision holds that whether the class of persons served is "indefinite" depends upon the type of choice or selection made by the organization to determine who benefits from its activities. *Id.* at 134, 807 A.2d at 447. The capacity of any nonprofit organization is finite and its mission is defined — typically quite narrowly — to provide benefits to groups such as fly-fishing enthusiasts or people with an interest in dairy farms. The choice the beneficiaries make in attending is irrelevant. The quality of "indefiniteness" depends upon the process by which the organization limits its services to a subgroup of the general population.

¶ 21. The majority opinion excludes from tax-exempt status any organization which uses a juried or merit-based selection process

---

[4] Approximately two percent of the American public participates in fly fishing; the majority of whom are over forty-five years of age. Recreational Boating & Fishing Found. and The Outdoor Found., A Special Report on Fishing and Boating 18 (2009), available at http://www.rbff.org/uploads/Research_section/SpecialReportonBoatingand Fishing.online.pdf.

in defining its beneficiaries. Whether the selection process is fair or open to all is of no consequence. The very existence of a "screening process" is said to be the "hallmark" of a disqualifying private use. *Ante*, ¶ 12. Unless the premises are "open to all" and "turn no one away," they cannot be said to serve an indefinite class.

¶ 22. This definition defines "public use" too restrictively and contributes in its small way to the "dumbing down" of artistic culture. Consider the case at hand. Tax-exempt status would be assured, apparently, if the artistic residencies were awarded by lottery or on a first-come basis. The beginner and the accomplished artist would be equally welcome. No one would be turned away — except perhaps by the fire marshal. This is a reasonable admissions policy for a museum or an exhibition dairy farm. It is less promising for an arts organization whose beneficiaries must demonstrate a measure of competence if their residency is to have value for them or for the public.

¶ 23. This is not a case like *Trustees of Vermont Wild Land Foundation v. Town of Pittsford*, 137 Vt. 439, 407 A.2d 174 (1979), in which the criteria for admission were suspect. In this case, the selection process is open to all and is described by both sides as fair and unbiased. Some 600 artists and writers attend annually out of 2,000 applicants.

¶ 24. Nor is this a "closed circle" case in which only members of the Boy Scouts or the Peace Corps are eligible to make use of the property. See *Fort Orange Council, Inc. v. French*, 119 Vt. 378, 125 A.2d 835 (1956); *Experiment in Int'l Living, Inc. v. Town of Brattleboro*, 127 Vt. 41, 238 A.2d 782 (1968), *overruled on other grounds by American Museum of Fly Fishing*, 151 Vt. 103, 557 A.2d 900. Despite an unsupported assertion by the trial court that "artists" form a defined class, artists as a group are both numerous and varied.[5] Artists can hardly be said to form a "closed circle" or a limited class of people.

¶ 25. Finally, this is not a case in which existing legislative language can be "strictly construed." The substantive law of what

---

[5] At last count there were 221,900 professional artists employed in the United States, exclusive of art teachers, designers, jewelers, photographers, and people in other related professions. Bureau of Labor Statistics, U.S. Dep't of Labor, Occupational Outlook Handbook 303 (2010), available at http://www.bls.gov/oco/ocos092.htm. This does not include the legion of serious artists and gifted amateurs who hold other jobs.

constitutes a public use derives entirely from decisional law. The statute itself is silent about what constitutes a public use. In his dissent in *American Museum of Fly Fishing*, Justice Peck criticized the three-part test as "out-of-the-hat, unsupported guesswork." 151 Vt. at 112, 557 A.2d at 905 (Peck, J., dissenting). To be fair, the development of the three-part test represents not so much "guesswork" as it does deliberate policy-making through case law. In the absence of new legislation, the judiciary remains responsible for refining its own test incrementally and in directions which avoid imperfect or anomalous outcomes.

¶ 26. A reasonable definition of "indefinite class of persons" should not exclude groups whose activities require training, practice, and technical accomplishment. "Public use" does not have to be limited to activities such as museum-going which anyone can do without preparation. Nothing in 32 V.S.A. § 3802 suggests that the term is so limited. The inclusion of private schools and colleges in other provisions of § 3802 is evidence that competitive admissions criteria need not stand in the way of tax-exempt status.

¶ 27. The phrase "indefinite class of persons" should include classes of people selected through an open, competitive admissions process. These would include artists selected through a juried process, musicians and actors who audition, and writers and poets who submit manuscripts to a competition. The activities of these groups provide obvious public benefit. The open nature of the competitions invites a class which is broad, numerous, and indefinite in its membership. That winning a place through a fair competition depends upon individual skill makes it no less "open to all."

¶ 28. Since I conclude that the majority has defined the statutory term "public use" too narrowly, I respectfully dissent.