NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 81

No. 2016-224

| | |
|---|---|
| Rutland County Parent Child Center, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| City of Rutland | November Term, 2016 |

Mary Miles Teachout, J.

John J. Kennelly and Shannon E. Lamb of Pratt Vreeland Kennelly Martin & White, Ltd., Rutland, for Plaintiff-Appellee.

Charles A. Romeo, City Attorney, and John G. Pritchard and Alexander M. Dean, Law Clerks (On the Brief), Rutland, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **DOOLEY, J.** The City of Rutland appeals a superior court decision that two buildings owned by the Rutland County Parent Child Center (RCPCC) are exempt from property taxation. The City argues that neither property meets the requirements of the public use tax exemption in 32 V.S.A. § 3802(4). We affirm.

¶ 2. RCPCC is one of fifteen parent-child centers in Vermont. In 1990, the Legislature enacted a law defining "parent-child center" and directing the agency of human services to provide grant funding for eligible centers. 1989, No. 269 (Adj. Sess.), § 2 (codified at 33 V.S.A. § 3701). Under the statutory definition, a parent-child center is a "community-based organization established for the purpose of providing prevention and early intervention services such as parenting education, support, training, referral and related services to prospective parents and

families with young children." 33 V.S.A. § 3701(a). The statute directs a parent-child center to "[r]epresent a designated geographic catchment area" and "provide leadership in the coordination of services for families with other community service providers." Id. § 3701(c)(4), (d)(1).

¶ 3. RCPCC owns two properties in the City, both of which are at issue in this case. In these two properties, RCPCC offers a variety of programs dedicated to providing support services to pregnant and parenting youth, the families of young children, and young children themselves. Many of these programs are administered and funded by the state, although some participants in one of the programs pay for the services they receive. Residents of Rutland County may contact RCPCC, and RCPCC will determine whether they are eligible for any of the services offered according to each program's eligibility criteria. The programs offered include: (1) Learning Together, a program that serves a maximum of twenty-five parenting or pregnant persons under the age of twenty-four who are actively seeking a high school diploma; (2) Pregnant and Parenting Teens, which provides parenting classes and pregnancy prevention under contract with the Department for Children and Families' (DCF) Child Development Division; (3) Reach Up, a program administered by DCF's Economic Services Division that provides case-management services, financial incentives, parenting education and support, as well as childcare for individuals and families transitioning from public assistance to self-sufficiency; (4) Intensive Family Based Services/Strengthening Families, a service providing educational supports for families with the goal of preventing placement in foster care; (5) Children's Integrated Services Early Intervention/Family Support, a program funded in part through a grant from DCF's Child Development Division that provides early intervention services, including speech, physical, occupational, and mental-health therapy for children under the age of three with developmental or social-emotional delays; (6) Building Bright Futures Direct Services Program, a service available to all families in Rutland County with children ages birth to six, which provides community education, support for new parents, and coordination services for home and center-based early education providers, including playgroups and welcome baby bags for babies born at Rutland

2

Regional Medical Center; (7) Parenting On Our Own in a Safe Environment (POISE), a program that provides off-site shelter for homeless pregnant and parenting persons ages sixteen to twenty-two and provided under contract with the Washington County Youth Services Bureau Boys & Girls Club, which is overseen by DCF; and (8) Early Education, a program available to all families in Rutland County with children aged six weeks to six years old that assesses each child's educational needs and prepares children to succeed in school. Some of these programs have very specific targeted recipient groups. For example, (1) to be eligible for Intensive Family Based Services/Strengthening Families, a family must have an open case with DCF, a mental-health or substance-abuse issue, a child under the age of three, and recent or current involvement with the Department of Corrections; (2) for Reach Up, RCPCC's contract with DCF requires it to give priority to parents under the age of eighteen when selecting participants; and (3) for Early Education, RCPCC's contract with the state requires that at least twenty-five percent of enrolled children receive a state subsidy. In each case, this targeting is required by the state agency that provides funding.

¶ 4. In late 2013, RCPCC sought a property tax exemption for the two properties that house the programs listed above. In early 2014, the City's tax assessor determined that neither property qualified for the exemption. After exhausting its administrative remedies, RCPCC filed for declaratory judgment in superior court pursuant to Vermont Rule of Civil Procedure 75, initially arguing that the properties qualified for a property tax exemption under either the public use or public school statutory exceptions. The superior court determined on summary judgment that RCPCC's properties did not qualify for the public school tax exemption but, after a bench trial, decided that RCPCC's use of the properties in question met the three-prong public use exemption test outlined by this Court in American Museum of Fly Fishing, Inc. v. Town of Manchester, 151 Vt. 103, 110, 557 A.2d 900, 904 (1989), and that, accordingly, both properties were exempt from property tax assessment. The City appeals this decision.

3

¶ 5.     In reaching our decision, we review the superior court's factual findings in the light most favorable to the party prevailing below and will set those findings aside only upon a showing of clear error. Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica, 2005 VT 16, ¶ 10, 178 Vt. 35, 869 A.2d 145. Our review of the court's conclusions of law is plenary and nondeferential—we will affirm the court's conclusions if they agree with the applicable law and are supported by the court's factual findings. Sigler Found. v. Town of Norwich, 174 Vt. 129, 130, 807 A.2d 442, 443-44 (2002).

¶ 6.     RCPCC claims a property tax exemption under 32 V.S.A. § 3802(4), which exempts "[r]eal and personal estate granted, sequestered or used for public, pious or charitable uses." The statute does not define public use, but we have held that a property qualifies for a public use exemption only where it satisfies three criteria:

> (1) the property must be dedicated unconditionally to public use;
> (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis.

Am. Museum of Fly Fishing, Inc., 151 Vt. at 110, 557 A.2d at 904. The party claiming an exemption bears the burden of showing eligibility for the claimed exemption, and we construe exemptions strictly against the party claiming the exemption. Vt. Studio Ctr., Inc. v. Town of Johnson, 2010 VT 59, ¶ 7, 188 Vt. 223, 5 A.3d 904.

¶ 7.     The parties agree that RCPCC's property meets the first and third elements of the American Museum of Fly Fishing test. While these elements are not in issue, it is helpful to our analysis of the second element to review why RCPCC meets the first element. The superior court concluded that RCPCC satisfied American Museum of Fly Fishing's first element because the properties at issue are each used for "government-funded social programs" conferring a "direct and immediate, rather than remote or incidental, benefit upon the public." The court also found

4

that RCPCC "has used its properties in Rutland for the exclusive purpose of its mission and purposes since the dates of purchase."

¶ 8.    We add that benefit to the public is addressed and acknowledged within the Legislature's statutory recognition of parent-child centers.  See 33 V.S.A. § 3701.  In recognizing the centers, the Legislature made the following findings of fact:

> (1) Appropriate prevention and individualized intervention services to prospective parents and parents with very young children have a positive effect on parent-child interaction and thus the child's wholesome development;
>
> (2) Prevention and early intervention services decrease future costs by reducing the need for specialized services for disadvantaged families and families with young children who are at risk medically, socially and educationally . . . .

1989, No. 269 (Adj. Sess.), § 1.  The Legislature went on to provide that parent-child centers were created to provide the prevention and early intervention services addressed in the second finding of fact, defining them as including "parenting education, support, training, referral and related services to prospective parents and families with young children including those whose children are medically, socially, or educationally at risk."  33 V.S.A. § 3701(a).  These are exactly the types of services that RCPCC provides in the two properties at issue.  All of the programs held at RCPCC's properties, including both those programs administered by state agencies and RCPCC's early childhood education program, serve this mission and purpose and, thus, each of the properties at issue here is wholly dedicated to the public use and satisfies the first element of the American Museum of Fly Fishing test.

¶ 9.    As noted above, the City challenges RCPCC's exemption eligibility under only the second of the three elements of the American Museum of Fly Fishing test.  This second element has two parts: first, a property's "primary use must directly benefit an indefinite class of persons," and second, that same primary use "must also confer a benefit on society as a result of the benefit conferred on the persons directly served."  Am. Museum of Fly Fishing, Inc., 151 Vt. at 110, 557 A.2d at 904.  The City argues that RCPCC does not satisfy the first of these two parts because each

5

of the properties at issue is primarily used for programs serving a discrete portion of the population, ranging from pregnant or parenting youth working toward a high school diploma to children ages birth to three with developmental delays. Thus, according to the City's reasoning, the primary use of each of these properties benefits a definite, rather than indefinite, class. The City also argues that RCPCC fails to satisfy the second part of the test above because, though the primary use of these properties may benefit the persons directly served, any benefit to society is incidental and remote.

¶ 10. The City misunderstands the application of the indefinite class requirement under the <u>American Museum of Fly Fishing</u> test. In making its argument, the City relies almost exclusively on our decision in <u>Sigler Foundation</u>.[1] The plaintiff in <u>Sigler Foundation</u> operated a dairy farm that offered various educational and demonstration programs to farmers, students, and researchers and was open to the public generally for observation. As here, the Town in that case argued that the plaintiff's use did not meet the second element of the <u>American Museum of Fly Fishing</u> test, and specifically, that there was no indefinite class of beneficiaries. We explained the second element of the test as follows:

---

[1] The City did not rely extensively on <u>Vermont Studio Center v. Town of Johnson</u>, 2010 VT 59, although that decision relies heavily on <u>Sigler Foundation</u> and, unlike <u>Sigler Foundation</u>, held that the beneficiaries of the organization, Vermont Studio Center, were not an indefinite class. We described the beneficiaries and program of VSC as follows:

> VSC is a nonprofit corporation that owns real property in the Town of Johnson. VSC's property is primarily used for an artists' residency program, and the direct beneficiaries of this program are artists, writers, printmakers, and photographers. Approximately 2000 individuals apply annually for 612 four-week residencies, and there are approximately fifty visual artists and writers on site each month.

2010 VT 59, ¶ 2. We further described the beneficiaries of the organization as "shar[ing] a proficiency in the arts (as measured by VSC)."

We have analyzed this case under <u>Sigler Foundation</u> in light of the City's argument and have not discussed <u>Vermont Studio Center</u>. Unlike this case, <u>Vermont Studio Center</u> deals with an alleged class of beneficiaries that is self-selected and is therefore voluntary.

6

The underlying principle behind the Court's definite/indefinite class distinction is the intent to distinguish uses that benefit the public from uses that benefit only a selected few. Public uses are characterized as such, in part because of the breadth and scope of the users who need not, as a prerequisite to availing themselves of these uses, belong to any exclusive group. Private uses, on the other hand, are characterized by the benefits bestowed on a particular, and most often, limited sector of the public usually distinguishable by certain characteristics or membership. Beneficiaries of public uses are often incalculable and may be without definition or common characteristics. Private users are finite and limited. It is the inquiry into the character and quality of an organization's "choice," "selection," or "judgment" criteria used to determine its beneficiaries that informs the question of whether or not the organization's use of its property benefits an indefinite class that is part of the public and, thus, confers a benefit on society.

. . . The broader the scope of an organization's beneficiaries, and less restrictive its criteria, the greater the likelihood it is engaged in providing uses for an indefinite class of persons. Restricted and limited benefits may be enjoyed only by a limited number of persons. The level of selection or choice or voluntary action or judgment exercised by the beneficiaries themselves is largely irrelevant.

174 Vt. at 134-35, 807 A.2d at 447.

¶ 11. We held that the findings clearly demonstrated that the farm's "beneficiaries [were] numerous and varied—ranging from school children on field trips to visiting scientists researching embryo sexing" and that "[w]hile the bulk of the Farm's beneficiaries [could] be identified as persons interested in dairy farming and related practices, the Farm [was] open to the public at large and [had] never turned anyone away." Id. at 135, 807 A.2d at 447. On this basis, we held that the farm served an indefinite class and that the plaintiff met the first prong of the second element of the American Museum of Fly Fishing test. Id.

¶ 12. The point of Sigler Foundation is that the beneficiaries for the purpose of the definite/indefinite class requirement are not solely the individuals or institutions who directly avail themselves of services or activities conducted on the property but rather the broader class of

7

persons who can apply to obtain services.[2] This is apparent from <u>Kingsland Bay School, Inc. v. Town of Middlebury</u>, 153 Vt. 201, 203-04, 569 A.2d 496, 497-98 (1989), a case decided shortly after <u>American Museum of Fly Fishing</u> and one of the first to apply the three-element test of that case. In <u>Kingsland Bay School</u>, we approved a property tax exemption for a group home that served five adolescents between the ages of sixteen and eighteen who were experiencing social and emotional difficulty. <u>Id</u>. at 206, 569 A.2d at 499. The group home was operated under contract with the Department of Social and Rehabilitation Services (SRS) (now DCF), and SRS and the plaintiff, Kingsland Bay School, jointly selected the adolescents who stayed at the group home. The purpose of the plaintiff's organization was to "provide residential services in a therapeutic milieu for adolescents with major life-adjustment problems." <u>Id</u>. at 202, 569 A.2d at 497.

¶ 13. In denying a property tax exemption, the Town of Middlebury made essentially the same argument that the City is making in this case—that the use of the property benefitted only a small, definite group of beneficiaries defined by specific eligibility requirements, and therefore, did not benefit an indefinite class of persons. We rejected that argument in <u>Kingsland Bay School</u> with the following analysis:

> This Court has described a definite class as "a group determined by choice or selection [implying] some kind of voluntary action or judgment." <u>New York Inst. for the Educ. of the Blind v. Town of Wolcott</u>, 128 Vt. 280, 286, 262 A.2d 451, 455 (1970). Accordingly, Peace Corps trainees and Boy Scouts are members of a definite class, <u>Experiment in Int'l Living, Inc. v. Town of Brattleboro</u>, 127 Vt. 41, 48, 238 A.2d 782, 786-87 (1968); <u>Fort Orange Council, Inc. v. French</u>, 119 Vt. 378, 384, 125 A.2d 835, 839 (1956), while blind children are not, <u>New York Inst. for the Educ. of the Blind</u>, 128 Vt. at 286-87, 262 A.2d at 455. In the instant case, the troubled adolescents do not become residents of Kingsland as a result of any voluntary action or judgment on their part. Nor are they selected solely by Kingsland; they become residents based on the joint determination of Kingsland and the contracting agency that Kingsland is capable of providing the appropriate services for them. Cf. <u>Experiment in Int'l Living</u>, 127 Vt. at 47-48, 238 A.2d at 786

---

[2] <u>Sigler Foundation</u> uses the term "beneficiaries" to include both the broad class of persons who will benefit from the activities of the property owner and the actual participants in the programs of the owner. To better explain the analysis, we have separated beneficiaries from participants who are part of that broad class.

8

(students selected solely by contracting agency). As in New York Institute, the purpose of Kingsland is to help adolescents without "any other limitation except for the capacity of its facilities." 128 Vt. at 286, 262 A.2d at 455. Consequently, those eligible for resident status of Kingsland constitute an indefinite class of persons.

Id. at 203-04, 569 A.2d at 497-98. Our decision in Kingsland Bay School implicitly recognized that the difference between the size of the beneficiary class—adolescents with major life adjustment problems—and the number of participants—five adolescents—required additional scrutiny to ensure the program was truly serving an indefinite class. We relied upon three characteristics in this scrutiny: (1) the nonprofit organization that owns the facilities has a broad definition of beneficiaries, but the number of participants is controlled by the extent of its facilities; (2) the beneficiaries are not taking voluntary action to join the class in the sense that persons join the Peace Corps or the Boy Scouts; and (3) the participants are selected pursuant to eligibility standards that are imposed externally by a state agency although the owner of the facilities may have a role in that selection. Id.

¶ 14. The first of these three characteristics is the hallmark of an organization that provides services. Limits imposed by resource availability and facility size make it impossible for an organization to deliver services to everyone in the broad class of beneficiaries. Under the City's argument, a large organization that delivered services to all adolescents with life-adjustment problems in a particular area could obtain a property tax exemption but a smaller organization, like Kingsland Bay School, that can serve only part of the beneficiary population could not. If we accepted this argument, virtually no service provider could ever obtain a property tax exemption. There is nothing in the legislative language that supports such a distinction, and our decisions clearly reject it. In fact, after Kingsland Bay School we held in Twin Valley Community Services, Inc. v. Town of Randolph that a property owner organization that provided a single house for three developmentally disabled individuals to live in, with necessary services, met the standards for an exemption. 170 Vt. 648, 649, 756 A.2d 1233, 1234-35 (2000) (mem.).

9

¶ 15. The second characteristic, that beneficiaries are not taking voluntary action to join a class, is actually a requirement as explained in the excerpt from Kingsland Bay School quoted above. The requirement is derived from New York Institute for the Education of the Blind v. Town of Wolcott, 128 Vt. at 286-87, 262 A.2d at 455, one of the cases quoted in Kingsland Bay School. It involved a summer educational camp for blind children; the Town argued that only blind children were eligible to attend, they applied to attend the camp, and therefore, they were a definite class. We explained that a "class is a group determined by choice or selection and implies some kind of voluntary action or judgment." Id. at 286, 262 A.2d at 455. Attendance at the camp was voluntary, but attendance was not the "voluntary action" that this Court found would make the class of beneficiaries definite. We applied this standard to the eligibility requirement that the beneficiaries be blind and held that because this physical trait was not voluntary, the class was indefinite. Id. at 286-87, 262 A.2d at 455-56; see also Sigler Found., 174 Vt. at 133, 807 A.2d at 446. Essentially, the rule of New York Institute for the Education of the Blind and Kingsland Bay School is that an eligibility requirement for beneficiaries that might otherwise make a class definite will not do so if the requirement reflects a condition the beneficiary cannot change. It is important to note that the voluntary choice determination is made at the beneficiary level and necessarily carries forward to the participants, who by definition are among the beneficiary class served by the organization.

¶ 16. The third characteristic, that funding for organization services comes from a government agency and eligibility for services is decided under standards imposed by the government agency, was a circumstance in Kingsland Bay School, 153 Vt. at 203-04, 569 A.2d at 497-98, but is not a requirement. We caution particularly that governmental funding is not a requirement, though it may be relevant. The main holding of American Museum of Fly Fishing was to overrule earlier decisions that required the property owner to provide an essential governmental function in order to obtain a tax exemption. 151 Vt. at 110-11, 557 A.2d at 904-05. We are not reestablishing that requirement here.

10

¶ 17.   This characteristic addresses a requirement that the service eligibility standards be reasonable and consistent with the mission of the organization and its beneficiaries.  This point was made in Sigler Foundation: "[i]t is the inquiry into the character and quality of an organization's 'choice,' 'selection,' or 'judgment' criteria used to determine its beneficiaries that informs the question of whether or not the organization's use of its property benefits an indefinite class that is part of the public." [3] Sigler Found., 174 Vt. at 134, 807 A.2d at 447.  The presence of a governmental funding source, and eligibility standards imposed by that funding source, are strong evidence that the service eligibility standards are reasonable.

¶ 18.   The properties at issue in this case fall within the ambit of the "indefinite class" requirement as explained above.  Plaintiff, like all parent-child centers supported by the state, has a broad social mission to improve child and family development through specific types of services.  Its funding and facilities are limited so it must prioritize its services, often with specific eligibility standards imposed by the state agency that provides funding.  While the services may not be involuntarily imposed on the direct beneficiaries, the circumstances that create the need for those services are not voluntarily assumed, and the eligibility standards reflect these circumstances.  With respect to the first part of the second element of the American Museum of Fly Fishing test, this case is controlled by our decision in Kingsland Bay School.

¶ 19.   The City's final, and main, argument concerning this part of the American Museum of Fly Fishing test is that there is only one way to show an indefinite class, and that is the way described in Sigler Foundation—that the property must be open to everyone.  As the City acknowledges, this is essentially an argument that Sigler Foundation overruled this Court's decisions in Kingsland Bay School and New York Institute for the Education of the Blind.  As we explained above, Sigler Foundation is fully consistent with Kingsland Bay School and, therefore, there is no ground to conclude that Kingsland Bay School is no longer good law.  Indeed, Sigler

_____

[3] As we discussed in note 2, the word "beneficiaries" here should be read as participants.

11

Foundation discusses both New York Institute for the Education of the Blind and Kingsland Bay School as precedents bearing on how the Court decided the case before it. Moreover, this Court has more recently cited Kingsland Bay School as binding precedent. See Inst. of Prof'l Practice v. Town of Berlin, 174 Vt. 535, 536, 811 A.2d 1238, 1240 (2002) (mem.).

¶ 20. The City also argues that the second part of the second element of the American Museum of Fly Fishing test is not met because RCPCC's programs benefit those directly served, but do not confer a benefit on society as a whole. More specifically, the City argues that the benefits of RCPCC's programs are essentially private in nature and RCPCC failed to present any evidence that without these programs, those directly served would be dependent on the state. The superior court found that the goal of RCPCC's programs was to educate families and provide support during the early stages of child development in order to minimize later reliance by at-risk families on state support. Thus, the court concluded that society benefitted from these programs by means of the direct benefits to program participants.

¶ 21. In our view, the City's argument is answered by the two factual findings made by the Legislature with respect to parent-child centers and the services they provide. These factual findings are set out above. See supra, ¶ 8. The Legislature's second factual finding directly responds to the City's argument: "Prevention and early intervention services decrease future costs by reducing the need for specialized services for disadvantaged families and families with young children who are at risk medically, socially and educationally." 1989, No. 269 (Adj. Sess.), § 1. Even if there was no evidence before the court on the public benefit,[4] this legislative finding would be sufficient to meet the requirement of the second part. We are implementing a legislative requirement, and the Legislature, albeit in a different context, has found that this requirement is

---

[4] Reeva Murphy, Deputy Commissioner for Child Development for the Department for Children and Families, testified that without the partner services of parent-child centers, families would be more dependent on local and state support. Based on this evidence and other aspects of RCPCC's presentation at trial, the superior court found "[t]he ultimate intended beneficiaries are members of the community at large, including not only in Rutland County but statewide."

12

met with respect to parent-child center programs. We agree with the superior court's conclusion about the public benefit:

> The overall goal is to make families function well and to provide education and early-life support in a manner that minimizes the need for ongoing reliance on state services over time. The fact that the State has chosen to provide such significant financial support for these early-life services shows a legislative intent of investing in providing these services to families at the front end of children's lives as a way of investing in a healthy future for the community as a whole, and not just for the benefit of the individuals involved. The benefit to the public is a reduction or minimization of the need to fund state services that participants might otherwise need throughout their lives.

¶ 22. The City argues, however, that the public benefit cannot be found with respect to the early education program, which it describes as a daycare program. The City relies on Brattleboro Child Development, Inc. v. Town of Brattleboro, in which this Court held that a daycare center could not show a public benefit because it was providing the care and education that would have been provided by the parents of the child at home. 138 Vt. 402, 407, 416 A.2d 152, 155 (1980) ("The controlling findings below indicate that BCD offers the same sort of educational experience as is usually obtained in a home where one parent does not have outside employment."). The superior court, based on the testimony of the Director of RCPCC, found that RCPCC's program was unlike that at issue in Brattleboro Child Development. The Director testified that RCPCC's program was a prekindergarten program that coordinated with the Rutland school system to enable it to make children ready for kindergarten using national curriculum. The Director also testified that the children were regularly assessed for progress during the program. The superior court concluded: "While some people think of this as 'child care,' it is designed as an educational program: the educational needs of each child are assessed and the program works to meet those needs and prepare each child for successful entry to school." We believe RCPCC's early education program is not a child care program as defined in Brattleboro Child Development such that our precedent is controlling. Further, we hold that the public benefit from the early education program falls within the overall description of RCPCC programs above. The second

13

part of the second element of the <u>American Museum of Fly Fishing</u> test is met with respect to all RCPCC programs.[5]

¶ 23.     Finally, the City also argues that because some RCPCC activities do not satisfy the public use test, and do not make tax exempt the property in which they occur, our decision must determine the limit of the tax exemption and the percentage of value that can be taxed.  Our ruling holds that all of the RCPCC activities satisfy the public use test and are uses that make RCPCC's property exempt from property taxes under 32 V.S.A. § 3802(4).  Thus, we do not reach the City's partial taxation argument.

<u>Affirmed</u>.

FOR THE COURT:

_____

Associate Justice

---

[5]  The Court in <u>Kingsland Bay School</u> stated without explanation that "Kingsland aided the State by providing training to individuals that needed specialized instruction, and thereby plainly conferred a benefit on the public."  153 Vt. at 205, 569 A.2d at 498.  This method of showing a public benefit would equally apply here to the extent that RCPCC is providing services that would otherwise be provided by state employees.  Because we adopt the rationale in the text, we do not consider whether the record supports the <u>Kingsland Bay School</u> method of establishing a public benefit.